WOODS *et al. v.* LINDVALL.

*(Circuit Court of Appeals, Eighth Circuit.   October Term, 1891.)*

1. MASTER AND SERVANT—DEFECTIVE STRUCTURE—SUFFICIENCY OF EVIDENCE.
    In making a railroad fill, a trestle was built beyond the end of the fill to carry out the dirt-cars for dumping, each car containing a cubic yard of dirt. The trestle was made of bents, consisting of two poles with a cross-piece spiked to the top, the feet being held together by cross-bracing.   Six bents, varying from 21 to 24 feet high, had been erected beyond the end of the dump, and stringers had been run across the first 5, but were not secured unless by a small rope tied round the cap.   The tops of the bents inclined slightly towards the fill, and they were not braced against each other, or supported longitudinally in any way.   Under the direction of the foreman, plaintiff and others were engaged in running out a stringer, which was 32 feet long, to reach the last bent, which was about 26 feet away, and just as they lowered the end of it onto the cap the whole structure fell, injuring plaintiff.   Several civil engineers testified that such a structure was unsafe.   *Held*, sufficient evidence to warrant the jury in finding that the structure was not built with a due regard to the safety of those working upon it.
2. SAME—VICE-PRINCIPAL—FOREMAN OF RAILWAY CONSTRUCTION.
    A foreman who is in charge of a gang of workmen engaged in construction work on a railroad, with full power to hire and discharge men and direct them when and where and how to work, is a vice-principal, notwithstanding that he occasionally lends a hand in the actual manual labor.
3. RES ADJUDICATA—DISMISSAL AFTER PLAINTIFF RESTS.
    St. Minn. c. 66, § 262, subd. 3, provides that a civil action may be dismissed by the court without a final determination on the merits, "where, upon the trial and before final submission of the case, the plaintiff * * * fails to substantiate or establish his claim or cause of action," etc.   *Held*, that, under the decisions of the state courts as shown in *Craver* v. *Christian*, 34 Minn. 397, 26 N. W. Rep. 8; *Andrews* v. *School-Dist.*, 35 Minn. 70, 27 N. W. Rep. 303; and *Conrad* v. *Bauldwin*, 44 Minn. 406, 46 N. W. Rep. 850,—a dismissal on defendant's motion, after plaintiff has rested, on the ground that he has failed to establish a cause of action, is not a judgment on the merits such as will prevent the bringing of a new suit.
    HALLETT, J., dissenting.
    47 Fed. Rep. 195, affirmed.

Error to the Circuit Court for the District of Minnesota.

Action for damages for personal injuries brought by August Lindvall against John Woods and Stephen B. Lovejoy, partners as Woods & Lovejoy.   Verdict for plaintiff.   Defendants appeal.   Affirmed.

STATEMENT BY CALDWELL, J.   This action was brought by the defendant in error to recover for a personal injury alleged to have been received through the negligence of the defendants.   The issues were a general denial and a plea of former adjudication.   Upon the conclusion of the evidence, the defendants moved the court to instruct the jury to

return a verdict for the defendants, on the ground that the plaintiff had failed to make out a cause of action against the defendants, which motion was denied. This ruling is assigned for error.

The facts of the case, as disclosed by the bill of exceptions, are in substance as follows:

The plaintiffs in error, who were defendants below, were railroad contractors engaged in the construction of a railroad bed for the St. Paul & Duluth Railroad Company for a distance of some 10 or 12 miles. The work consisted in constructing a road-bed by making cuts in hills and in filling low places. The defendants, about New Year, 1888, started in on the work at three different places, with three separate crews. One of the crews was under the charge of one Aleck Murdock, and the work by it to be performed was cutting down a hill near Gladstone, Minn., and filling a long stretch of low country below said hill. Another crew, under one Woods, a brother of one of the defendants, was at work from the other side of the hill in an opposite direction; and the third crew, a mile or two distant, was under the charge of one Mahoney. The work in charge of Aleck Murdock was performed as follows: At the base of the hill a trestle-work was erected, consisting of 10 trestles, all raised at the same time, built of square timbers, and consisting of trestle-bents from 2 to 5 feet high, on which were laid stringers. On these stringers were placed ties, to which were bolted iron rails, thus constituting a track on which to run out "Petler" dumping-cars filled with dirt in the cut, which dirt was dumped at the end nearest the hill, until a sufficient fill was produced. The stringers were not in any way fastened to the trestles, nor were there any longitudinal braces between the bents. After the first 10 bents had been filled up with dirt, the work proceeded in the same manner, except that from that time to the day of the accident only 1 or 2 bents were raised at any one time; and as the work progressed the trestle-bents became higher, until they, on the day of the accident, were from 21 to 24 feet high. There was also this difference, that instead of square timber round timbers were used, about 10 to 12 inches at the bottom and 7 to 8 inches at the top. The caps of the trestle-bents were also round timbers surfaced on the top for about 5 inches. These caps were from 8 to 10 inches through. They were fastened to the legs of the trestle with spikes. At the ends the caps were also surfaced below for about 5 inches. The distance between the legs at the ground was about 13 feet; at the top, about 2 feet. The caps were about 6 feet long. There were no longitudinal bracing or bracings of any kind between the different trestle-bents, but the legs of each trestle-bent were held together by cross-bracing. On top of the caps were placed, at 2 feet distance from each other, 2 stringers of 8x10 sawed timbers, and of different lengths, some 16 feet and some 32 feet. When the 16-feet stringers were used the distance between the trestle-bents was about 12 feet. When the 32-feet stringers were used the distance was about 27 feet. The stringers were not laid so as to buttress one against the other, but so as to overlap one beside the other. The stringers were not bolted or spiked to the caps, nor were they provided with chucks on either side of the caps, nor

were there any bolts driven in them on either side of the caps, nor were they fastened in any way to the trestle-posts, except that the person who had charge of the building of the trestles and their erection, after the 10 first trestles had been built, was in the habit of tying with the hand a three-quarter or one-inch rope around the stringer and the cap, which Murdock had observed. He had no orders either from defendants or from Murdock to do this: He used no other force except his hands with which to tighten or tie the ropes. On top of these stringers, but not spiked or fastened to them, were then laid ties and rails in the same manner as was done on the first 10 trestles erected, the rails spiked to the ties, and the rails fish-plated at the end, 30-foot rails, 40 to the foot. At the time of the accident there was a continuous track of about 400 feet from the cut. When the fill was completed the stringers were taken out and used for further trestles, and the ties were then made to rest on the dirt. At the time of the accident about 35 or 40 trestle-bents had been erected at this particular place under the charge of Mr. Murdock, by one Johnson. The men working at this place under Murdock consisted of different sets of men. One set of men, about 20 or 30, worked in the cut digging out the dirt and filling the cars. One set of men were to drive the teams which hauled the cars from the cut to the dump and back. One set of men, consisting generally of 4 or 5 men, worked at the dump or the end of the fill, unloading the cars and evening the dirt, shoveling and tamping under the track. One man, Johnson, built the trestles, and raised them and put them in position, placed the stringers, and laid on them the ties and track, with the assistance of other men furnished him on his request by Murdock. Of all these different men, —both those in the cut, on the dump, the teamsters, and the trestle-builder,—Murdock had the charge and control. He hired and discharged the men under him; directed the work, how it should be done and when it should be done; ordered the men working under him to go to any different place when he so desired. Nobody else gave any orders to any of the men, and they were all bound to obey his orders and directions. He went from the cut to the dump and on the trestle-work, back and forth. He did not work himself, unless to show the men how the work should be done, but occasionally took hold to help the men out. The defendants both resided at Minneapolis, about 20 miles away from the place. During the progress of the work defendant Lovejoy was never there. Defendant Woods visited the works two or three times a week, but stayed only for a short time,—sometimes a few minutes and sometimes an hour or more. He did not give any orders to the workmen, nor direct them in any manner. If any orders were given by him, they were given to Mr. Murdock. Murdock set Johnson to work to build trestles when the work first commenced, soon after New Year. The first 10 trestles were raised by Murdock with Johnson's assistance. All the subsequent trestles were raised by Johnson on Murdock's orders. The trestle-work was built for temporary purposes; the bents to remain in the fill, but the stringers to be taken out. Immediately before the commencement of the work at Gladstone, Murdock had had charge of a

similar work in Lowry and Douglas Hill, in Minneapolis. While working at these hills under Murdock, in the fall and winter before and shortly before going to Gladstone, Johnson, who had been working at oiling and fixing cars, was by Murdock set to work building trestles. Before setting him to work Murdock asked him if he was good at bridge building. Johnson told him he did not understand anything about it at all. Johnson was not a carpenter. He had not learned the trade of a carpenter. Murdock then set him to work building trestles in Lowry and Douglas Hill, where Johnson built altogether six or seven trestles. Johnson had had no experience in trestle building before the six or seven trestles in Douglas Hill, and those he then built were all that he had built before, except that he had helped build a stable for the horses and a camp for the men before he was put to work at building and raising the trestles on the works near Gladstone.

In April, 1888, plaintiff came out to Gladstone and applied to Murdock for work. Murdock told him that he could go to work on the dump. His duties in working on the dump were dumping cars, shoveling dirt, and tamping up the track; that is to say, to fill up dirt under it and under the ties. His duties did not call him any further out on the trestle-work than to the edge of the dump. He worked for defendants from April 2d till April 20th, when injured. He had nothing to do with the building of the trestles, or with erecting the trestle-work, or with the placing of it in position, or in placing the track, and the only assistance he ever gave to this work was one morning a few days after he came to the works, when he, at the request of Johnson, helped to shove out a couple of stringers. On the morning of the accident, when the men came to work, there were two trestle-bents standing. The one nearest to the dump was covered with dirt one-half way up the legs, and the dirt ran on a slope from that bent down about one-half way to the next bent. The stringers running from the bent standing one-half way up in the dirt to the bent wholly covered up were 32-feet stringers. The stringers from the bent partly covered with dirt to the bent outside were 16-feet stringers. Johnson helped shoveling on the dump when he had nothing else to do with building or raising trestles. The morning of April 20th Johnson was on the dump with the dumpmen filling up dirt under the ties where it had sagged away during the night, when Murdock came down with the men from the cut for the purpose of digging a trench between the two last trestles then standing. There were then four more trestle-bents already built and lying on the ground. When Murdock came down with his men from the cut in the morning he told Johnson to raise the remaining trestles and put them in position. Johnson, with the assistance of plaintiff and Peterson, then first took out the long stringers lying between the bent entirely covered with dirt and the bent standing in the dirt one-half way up, and in place of these long stringers put in 16-feet stringers, resting with one end on the dirt at the upper end of the dump.

v.48F.no.1—5

The ropes with which the long stringers were tied to the cap were untied, and probably not tied on after the short stringers were put in. He thereafter, while plaintiff remained on the dump leveling the dirt and filling up under the ties and the track, with the assistance of one Peterson, went to work to raise three more trestle-bents, which was done by aid of block and tackle; one of the teamsters driving his team up the track, and thus aiding in raising the trestles. After each trestle was raised Johnson and Peterson laid stringers on them as heretofore described, without fastening them in any way whatsoever, unless they were tied with ropes as heretofore described. The same men thereupon laid the ties and track onto the stringers. The stringers used for the first two trestle-bents erected that morning were short stringers. None of the trestle-bents erected that morning were provided with longitudinal bracing; nor were there any chucks on the stringers or any bolts on either side of the cap; nor were the stringers bolted or nailed to the caps; nor were the ties bolted or nailed to the stringers. All of the trestle-bents erected that morning were leaning in towards the dump. The one furthest from the dump about eight inches or one foot; the next one about the same; the next one about one foot and a half; and the next one about two feet or two feet and a half. Johnson cannot remember whether any of the stringers on the trestle-bents erected that morning were tied with ropes, but plaintiff saw ropes tied on one or two pairs of them on one side, when he went out with the stringers as hereinafter stated. At this time there were then five trestle-bents standing, one of which was covered with dirt one-half way up, and all the other wholly uncovered. None of the trestle-bents were provided with footings, nor were they dug into the ground, but were placed on top of the ground, except one; one leg whereof, on account of a slant in the ground, was partly dug in. There was then only the sixth trestle left on the ground. Johnson placed the lower part of this trestle about 22 or 24 feet away from the last trestle standing; placed sticks in front of the legs, and fastened the rope and tackle in the cap which was lying furthest away from the trestle-work, and caused it to be raised in this way, by aid of horse-power; having first secured the cap with a guy-rope to a stick placed some distance ahead.

This last trestle was heavier than the others, and was provided with a footing. Up to this time the plaintiff had taken no part in the work of building or placing in position the trestles which were erected that morning, nor in shoving out stringers on them, nor in placing the ties or track on them, but had been busy at the dump shoveling and tamping, and had paid no attention to the work on the trestle beyond him. About this time Murdock, whose crew from the cut had got through digging the trench, and who had taken his men back into the cut, came down on the dump, where plaintiff and Peterson were then standing, shoveling. The long stringer which Johnson had taken out at the end of the dump was then lying beside the track on the dump. On the track beside these stringers were lying a couple of rollers. On going down Mr.

Murdock ordered plaintiff to take hold of those stringers and help to shove them out, so as to get the stringers out before the cars should come down with the dirt. Charlie Peterson and plaintiff then took hold and lifted the stringers upon the rollers lying on the track, and plaintiff and Peterson commenced to shove the stringers on the rollers, Mr. Murdock assisting them, until the last roller was passed, when one of them took and placed it in front, and thus the work of shoving them out proceeded. The track was laid only one-half way out between the two last bents standing, and on which stringers were laid, and as the front roller dropped from the track down onto the stringers, Mr. Johnson came up on the trestle-work. At the same time a car came down from the cut, and Mr. Murdock went back towards it, while Johnson took his place, and the work of shoving the stringers out proceeded until the front roller struck the rope, with which the stringers already laid were tied to the cap of the last bent standing. The stringers moved were then so far out that they were about to tip for the men. Johnson then called Murdock, telling him that the stringers were going to tip, and that he had better come out and help them. Murdock came out and took hold, and told Peterson to go and get a piece of rope, which he did, and Murdock then tied the rope around the stringers which they were shoving out, and put one end of the rope around the end of the stringers lying in position, and made it tight, so they could hold them, and then ordered Johnson to go down on the ground and loosen the guy-rope, and let the sixth trestle come in a little. Johnson did so. At this time the hind end of the stringers, which were being moved, had left the track, and plaintiff knelt down on the stringers and held down the end of one of the stringers with both his hands, while Murdock had hold of the rope. After Johnson had got down on the ground and loosened the guy-rope and let the bent down a little, Murdock asked if it was far enough in, to which Johnson answered, "yes," and he tied the guy-rope. Mr. Murdock then eased up on the rope so as to let the stringers down onto the cap of the bent, then about to be raised, and just as the stringers touched the cap the whole trestle-work fell down in towards the dump, the only trestle remaining standing being the sixth one, which was held up by the guy-rope and the trestle which stood partly buried in the dirt, and perhaps the one nearest beyond this. The fall was not occasioned by the breaking of any portion of the appliances; nothing broke. When the trestle-work fell down to the ground plaintiff fell with it, and was injured.

Plaintiff had seen parties raising the trestles that morning, but did not notice how they were built. He had never worked on trestle-work before, and had no knowledge of how such work should properly be built or secured in order to make it safe, nor had he any knowledge of whether any longitudinal or other bracing or any fastenings other than what was used at the place was necessary in order to make the trestle-work safe to go out on. He did not know, and could not see from the place where he was working, whether or how the trestles were braced or how they were secured. But the trestles were in sight from the dump where he

was working from the time he commenced to work. He had no knowledge of the trestles erected that morning leaning in towards the dump. He did not know Johnson before he was working out there, except while working at Douglas Hill, in the city of Minneapolis. Knew nothing about his want of experience in building trestles. Did not know he was not a trestle builder or a carpenter, but knew in a general way what he was doing at the works. When the trestle-work which fell down was again erected by the defendants, longitudinal bracing between the different bents was used. There were at the place where the trestle-work was being built sufficient materials of all kinds for the work and for the bracings, and sufficient of bolts, nails, and spikes of all sizes, and sufficient tools and implements for the work.

Plaintiff introduced testimony by four civil engineers, who were graduates as such, and who had had a large experience in bridge building and trestle building, tending to show that the trestle-work in question, even supposing the stringers had been tied with ropes to the caps of the different bents, was unsafe to send people to work upon, pushing out stringers of the length and dimensions testified to, and that in order to make the structure reasonably safe the stringers should either have been bolted to the caps, or a plank should have been bolted to the stringers on each side of the cap, thus making a chuck, commonly called, or else spikes should have been placed in the stringers below on each side of the cap, or else there should have been provided longitudinal bracing between the different bents. The defendant's evidence tended to show that the fall of the trestle was not occasioned by the breaking of the structure, or any part of it, or any of the appliances. Nothing broke; the fall was occasioned while Murdock, plaintiff, and Peterson were endeavoring to extend the last pair of stringers to the bent which Johnson had just tied with the guy-lines. That the men were under no stress for time within which to put up this temporary trestle. That the defendant John Woods attended to the outside work of the defendants at and during all the time mentioned, and retained and conducted the supervision of the work in person, and was at this point and the other points where the other crews were at work, viz., the crews under Mahoney and under Frank Woods, as a rule, every week-day, or at least five times a week, and gave directions and made suggestions to the foremen themselves. That the foremen, including the foreman Murdock, had the privilege of setting men to work if any should apply, and there was a place for them on the work, or, if it became necessary for any reason, he could give them a bill of their time, and send them to the defendant for their pay, which was equivalent to a discharge. That beyond this he had no power in the hiring or discharging of any man; that he did not fix the wages of any man; that he simply did the work of any foreman on the work; kept the time of the men, and saw that they were about their work and doing what they were employed to do; that he took hold with the men whenever and wherever occasion presented itself, and when his assistance was required in assisting the men in doing what they were engaged

upon. That he did not employ the plaintiff, beyond telling him, when he applied to him that morning of the 2d of April, that he could go down on the dump to work with Johnson; that at the time of the accident it appeared by the defendant's testimony that the plaintiff was upon this temporary trestle, as were also Charlie Peterson and the man Johnson, when he (Murdock) was called by Johnson, and went out there to help hold the stringers. That no express directions were given to plaintiff or to either of the men to go out on the structure. Plaintiff, Johnson, and Peterson performed this work in this way as a part of the work in constructing the road; that the trestle was a temporary trestle only, and was only to run out empty Petler-cars on, carrying a cubic yard of dirt, after they were dumped. The trestle-bents were left in the fill. It also appeared by the defendants' evidence that the defendants at all times furnished and provided sufficient of all kinds of tools and implements and material for the work, and the defendants Woods and Mr. Murdock told the men and told the plaintiff to be careful to avoid accidents. Several witnesses also testified on behalf of the defendants, as experts, to the effect that the structure as described was a reasonably safe place and structure for the purpose for which it was constructed, if tied with ropes around the stringers to the caps. The defendants also showed that the man Johnson did his work well, and, after being shown how to put up and build temporary trestles on Lowry Hill and Douglas Hill, had always built the temporary trestles, and performed his work well. That the foreman, Murdock, performed his duties and did his work well.

To support their plea of a former adjudication, the defendants offered in evidence a duly-certified record, which showed the following facts: That the same plaintiff had brought an action against the same defendants upon exactly the same cause, for the same injury, in the district court of the state of Minnesota for the county of Hennepin, a court of general jurisdiction in said state. That upon the trial of said cause in said district court, after the plaintiff had put in all his evidence and rested his case, the defendant moved said district court to dismiss said action, upon the ground that the evidence of plaintiff did not make out a case against said defendants, which motion was granted, and said action was dismissed. That thereupon the plaintiff procured a stay of proceedings, and made up and procured to be settled and signed by the judge who tried the case a settled case and exceptions, containing all the evidence, and upon the pleadings and such settled case made a motion for a new trial in said district court. That said motion for a new trial was denied. That thereupon said plaintiff, under the practice and procedure in the Minnesota courts in such cases, appealed to the supreme court of Minnesota from said order denying the motion for a new trial, and carried to the supreme court upon such appeal the pleadings and all the evidence given in the court below. That the case upon said appeal was duly heard and tried in said supreme court, and the decision and order of said district court was in all things affirmed. 41 Minn. 212, 42 N. W. Rep. 1020. That thereupon a mandate issued from said

supreme court to said district court for further proceedings in accordance with such decision, and, upon the filing of said mandate, judgment in said cause was given and entered in said district court, "that said action be and is hereby dismissed." The court below excluded this record, and that ruling is assigned for error. The opinion of the circuit court on this question is reported in 47 Fed. Rep. 195.

The Minnesota statute (St. c. 66) upon the subject of the dismissal of actions is as follows:

"Sec. 262. *Dismissal of action.* The action may be dismissed without a final determination of its merits, in the following cases: *First.* By the plaintiff himself at any time before trial, if a provisional remedy has not been allowed or counter-claim made; *second,* by either party with the written consent of the other; or by the court upon the application of either party, after notice to the other, and sufficient cause shown at any time before the trial; *third,* by the court, where, upon the trial and before the final submission of the case, the plaintiff abandons it, or fails to substantiate or establish his claim, or cause of action, or right to recovery; *fourth,* by the court, when the plaintiff fails to appear on the trial, and the defendant appears and asks for the dismissal; *fifth,* by the court, on the application of some of the defendants, when there are others whom the plaintiff fails to prosecute with diligence. All other modes of dismissing an action, by nonsuit or otherwise, are abolished. The dismissal mentioned in the first two subdivisions is made by an entry in the clerk's register; and a notice served on the adverse party. Judgment may thereupon be entered accordingly. Sec. 263. *Judgment on the merits.* In every case, other than those mentioned in the last section, the judgment shall be rendered on the merits."

John M. Shaw and Willard R. Cray, for plaintiffs in error.

John W. Arctander, for defendant in error.

Before CALDWELL, HALLETT, and THAYER, JJ.

CALDWELL, J. The effect of the judgment of the state court, dismissing, on the defendants' motion, the action brought in that court, at the conclusion of the plaintiff's testimony, upon the ground that the plaintiff had failed to make out a case, is a question of local law depending on the construction of a statute of the state. It appears from the latest adjudged cases to be the established doctrine of the supreme court of Minnesota that under the statute of that state, upon a dismissal of the action when the plaintiff rests his case, on the motion of the defendant, upon the ground that the plaintiff has failed to establish a cause of action, the proper judgment to render is one of dismissal merely, such as was rendered in this case. That court holds that such a judgment is not a judgment upon the merits of the action, such as will bar the plaintiff from maintaining another suit for the same cause, but that it is, in effect, nothing more than a common-law or voluntary nonsuit. *Craver* v. *Christian,* 34 Minn. 397, 26 N. W. Rep. 8; *Andrews* v. *School-Dist.,* 35 Minn. 70, 27 N. W. Rep. 303; *Conrad* v. *Bauldwin,* 44 Minn. 406, 46 N. W. Rep. 850. The construction placed on the state statute by the supreme court of the state will be followed by this court. The record of the judgment of dismissal constitutes no bar to this action, and it was rightly excluded.

Did the court err in refusing to instruct the jury at the close of the evidence to return a verdict for the defendants? The solution of this question involves the application of the law to the facts of the case. There is no room for controversy over the material facts upon which the case must turn. They are very fully set out in the statement of the case. There was abundant evidence to warrant the jury in finding that the trestle was constructed without a due regard for the safety of those who were to work upon it. It was not braced between the trestle legs; the stringers laid on top were not spiked to the caps of the bents; the ties and track laid on the stringers were not spiked to the stringers; there were no chucks on the stringers on either side of the caps; nor any bolts driven into them on either side of the caps. The evidence shows that the doing of one or more of these things was necessary to render the structure reasonably safe and secure. The only means used to hold it together was a rope tied by hand around the stringers and the caps at each trestle-bent. It is not claimed that the plaintiff was guilty of contributory negligence, or that he constructed or assisted in constructing the bents or trestles. He was employed by Murdock to work on the dump,—that is, to dump cars, shovel dirt, and tamp the track; but Murdock could assign him to do any other work, and did require him to assist in raising trestle-bents when his services were necessary, and he was on the trestle by Murdock's order, assisting in raising a trestle-bent, when, without any fault or negligence on his part, the trestle upon which he was at work, by reason of its imperfect construction, fell and injured him.

Are the plaintiffs in error chargeable with this faulty construction of the trestle, and liable to the defendant in error for the injury he sustained by reason thereof? If this trestle had been erected under the immediate personal supervision and direction of the plaintiffs in error, it is clear they would be liable. But, instead of supervising and directing the work in person, they delegated this power and duty to Murdock; and it is said Murdock and the plaintiff are fellow-servants, and that the rule which precludes a servant from recovering from his master for an injury received through the negligence of a fellow-servant is applicable to this case. The proper construction of this trestle was a work that required more mechanical skill, judgment, and experience than is commonly possessed by the ordinary laborer, and the plaintiffs in error recognized this fact. They appointed a foreman to superintend, direct, and control the work. Murdock was intrusted with full control of the construction work on the section of the railroad embracing this trestle. He had authority to direct all the men on that section—between 30 and 40 in number—when to work, where to work, and how to work, and it was their duty to obey his orders. He superintended and supervised all the work on the section, and hired and discharged workmen, at his discretion. In these respects he was invested with all the power and authority his principals possessed. He did not ordinarily do manual labor; his chief duty was to personally supervise the work, including the building of the trestle, and to give directions how all parts of the same should

be done. He went back and forth between the places where the different crews were at work on the section, directing and instructing, and occasionally assisting, each of them in the work they were doing. Johnson, who framed the bents and put up the trestle, worked in obedience to his orders, as well as the other men. As the plaintiffs assumed through Murdock the superintendence and control of the construction of the trestle, they were bound to exercise ordinary care to make it reasonably safe and secure for those called to do work upon it. In the discharge of this duty Murdock occupied the place of the plaintiffs in error, and any failure on his part to exercise ordinary care in the discharge of this duty is imputable to them.

Whether the trestle was one of those structures the building of which the master might have committed to ordinary fellow-laborers, without any instructions or superintending care, by simply providing them with adequate materials and tools to do the work, need not be discussed. The plaintiffs in error did not attempt to build the trestle in any such way. They did not leave the mode and manner of its construction to the discretion or judgment of the laborers doing the work, but they constituted Murdock their representative, and imposed on him the duty, and conferred on him the authority, to supervise, direct, and control its construction, and required the laborers to obey his orders and directions in the premises. Under these circumstances, Murdock did not sustain the relation of a fellow-servant to the defendant in error in respect to this work. He stood in the shoes of his employers, and was their representative, and they are responsible for the results of his negligence in the work so committed to his direction, supervision, and control. This is the doctrine of the supreme court of the United States, (*Railway Co.* v. *Ross*, 112 U. S. 377, 5 Sup. Ct. Rep. 184; *Railroad Co.* v. *Herbert*, 16 U. S. 642, 6 Sup. Ct. Rep. 590,) and is the rule laid down in this circuit, (*Borgman* v. *Railway Co.*, 41 Fed. Rep. 667,) and by the courts of last resort in many of the states, and is appropriately denominated the "American Rule," (Shear. & R. Neg., 4th Ed., §§ 226–228.) This court unanimously approved and applied the rule in the case of *Railroad Co.* v. *Wilson*, 48 Fed. Rep. 57, (decided at the present term.) The reasons in support of the rule are forcibly and convincingly stated in the authorities we have cited, and need not be repeated here. In our judgment, the rule is right in principle, and is supported by the weight of authority. There was abundant evidence to warrant the jury in finding that Murdock did not exercise ordinary skill and care in supervising and directing the construction of the trestle, and that by reason of this negligence on his part the trestle was so defectively and imperfectly constructed that it fell and injured the defendant in error. This disposes of the first, second, and third assignments of error.

According to the view we have taken of the case, the court below properly modified the third request to charge, and properly refused the thirteenth and fourteenth requests. The fourth, fifth, and sixth assignments of error are therefore untenable. In the seventh assignment complaint is made of the action of the court in leaving the jury to determine

whether Murdock and Lindvall were fellow-servants, but as that issue was, in our opinion, rightly determined by the jury, and submitted to them under proper directions, the seventh assignment of error is untenable.    The judgment of the court below is affirmed.

HALLETT, J., dissents.