**THOMSON v. BOLES.**

No. 11997.

Circuit Court of Appeals, Eighth Circuit.

Nov. 25, 1941.

Alfred E. Rietz, of St. Paul, Minn. (Warren Newcome, of St. Paul, Minn., and W. T. Faricy, of Chicago, Ill., on the brief), for appellant.

William H. DeParcq, of Minneapolis, Minn. (Eugene A. Rerat and Walter J. Welch, both of Minneapolis, Minn., on the brief), for appellee.

Before SANBORN and JOHNSEN, Circuit Judges, and NORDBYE, District Judge.

NORDBYE, District Judge.

This action was brought by William F. Boles against Charles M. Thomson, as trustee of the Chicago and North Western

Railway Company, under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., to recover damages for injuries sustained while employed as a brakeman on appellant's railroad. A verdict was returned for the plaintiff and the trustee appeals from the judgment entered thereon. The parties will be referred to as designated in the trial court.

Boles was employed as a brakeman by the defendant company. On June 12, 1940, the day of the accident, he was engaged, among other duties, in transmitting signals to the engineer of a work train employed on defendant's line in driving piles in a certain bridge which spans the Kickapoo Creek near Kickapoo Junction, Illinois. The southerly portion of the bridge is of steel construction and the northerly 178 feet are of wood construction. Along the easterly side of the wooden portion of the bridge was a guardrail or fence alongside a plank walkway which extended for some distance adjacent to the railroad track. The guardrail consisted of 4 x 6 uprights bolted to stringers or ties, with three 2 x 4's spiked to the inside of the uprights. At the top of the upper 2 x 4's, as well as on the uprights, was spiked a 2 x 6 plank. The railing was about 40 inches in height measured from the plank walkway to the top of the 2 x 6. The walkway extending along the railroad track was 2 feet 10 inches in width. Next to the walkway and parallel thereto and between it and the rails was a 6 x 6 timber. The distance between this timber and the nearest rail of the track was 2 feet 6 inches. The walkway was maintained for trainmen to use while walking along the trains, and the railing was for their protection.

Prior to this accident, defendant had made plans to reconstruct this bridge. In order to drive concrete piles in certain parts of the bridge, sections of the guardrail had been taken out and a new guardrail put in. Six of these sections or gates had been put in along this railing. The purpose of these gates was to enable the workmen to remove a particular section to accommodate the hammer of the pile driver when piles under the walkway were being driven. These gates were nailed and the nails would have to be drawn out in order to remove them. However, as the instant work was being carried on, the guardrails were intact and presumed by everyone to be safe and secure, and, as far as the evidence indicates, afforded sufficient protection for the workmen who were required to use the walkway in connection with their train duties. At no time on the day of the accident were there any open sections in the guardrails. Apparently, these gates or sections had been installed prior to the day of the accident so as to enable their removal when necessary, and thus facilitate the use of the pile driver when the occasion required it for the driving of piles at any designated place.

In carrying on the work of driving piles, defendant employed a work train, consisting of a locomotive, caboose, flat car and pile driver. Plaintiff's duties as brakeman consisted of flagging the work train as it moved on the bridge from the north. The first movement concerned the bringing of a pile and setting it at a point toward the northern end of the bridge. After placing this pile, the train took up another pile and moved it to a point some 25 feet north of where the first pile was set. It was the duty of the plaintiff to spot the pile driver, and, in the performance of these duties, he was on the walkway in order to be in a position to give the necessary signals to the engineer. It was necessary for him to be on this walkway, not only for the purpose of giving signals, but because it was the safest and most convenient place for him to be. Furthermore, in his position thereon, the engineer could readily see him and observe any signals that he might give from time to time. Immediately before the accident, the plaintiff was standing some short distance south and east of the pile driver. The pile driver was engaged in driving a pile in the center of the track, which operation did not disturb the guardrail or necessitate the removal of any gate therein, and while at the immediate moment there were no signals to be given, nevertheless, in the performance of his duties, plaintiff was required to be in a position where, if any emergency arose or any situation existed which required signals to the engineer, he would be on duty for that purpose. While there is a marked dispute in the testimony as to whether plaintiff at this particular time was sitting on a new section or gate of the guardrail, as was contended by some of defendant's witnesses, or was merely leaning against a part of the old railing north of the gate, there was ample evidence for the jury to find that, while plaintiff was up against the railing and

leaning against it, he was not sitting on the guardrail or any part of the gate. He contends that his right foot was on the lower rail of the old guardrail and his left foot was resting on the walkway. Hannum, the conductor, and plaintiff's immediate superior, stated that plaintiff was occupying a usual and customary position immediately prior to the accident and that there was nothing unusual or improper about it. Just before the accident, according to plaintiff's evidence, Hannum put his right foot on the bottom railing at a place close to where plaintiff was located and started to lean against it, and thereupon a part of the railing broke, gave way, and both were precipitated to the ground some 22 feet below. It was a section of the old railing which gave way. A part of this section was produced by the defendant at the trial, and an examination thereof indicated that the wood was cracked, decayed and rotten; that the nail holes were worn larger than the nails; and that a splice assuming to make secure the old railing adjacent to the gate had been negligently constructed. Defendant, however, contends that the railing produced in court was not the portion of the railing against which plaintiff was leaning, or on which he was sitting. It is the defendant's contention that plaintiff was sitting on one of the gates hereinbefore referred to, and that he lost his balance and grabbed the old part, pulling it out, causing a part of the old railing to be torn away at the time he and the conductor fell.

The principal points relied upon for reversal are: (1) That the trial court refused to grant defendant a directed verdict; (2) that there is no substantial evidence of negligence on the part of the defendant; (3) that there is no substantial evidence that the negligence of the defendant, if any, was the proximate cause of the injury to the plaintiff; (4) that the verdict is not only contrary to, but is against the manifest weight of the evidence; (5) prejudicial and inflammatory statements to the jury in the opening statement of plaintiff's counsel; (6) errors in ruling on the reception and rejection of evidence; (7) prejudicial, inflammatory and unwarranted statements by plaintiff's counsel in his closing argument; and (8) errors in the court's charge and in refusing to instruct the jury as the defendant requested. We will consider these contentions in the order stated.

■ At the outset, it seems clear that we must commence with the premise that the jury found that the guardrail gave way while plaintiff, in the performance of his duties, was standing on the walkway and while he was leaning with some of his weight against the portion of the fencing which broke. That there was ample evidence to sustain such finding is free from doubt. Furthermore, the evidence fully warranted the jury in finding that the portion of the rail which yielded was unsafe and insecure by reason of its rotten, decayed and worn-out condition, and that therefore the defendant was negligent in failing to maintain a reasonably safe guard rail for the bridge. Woods v. Lindvall, 8 Cir., 48 F. 62; Cawman v. Pennsylvania-Reading Seashore Lines, 3 Cir., 110 F.2d 832; McDonald v. City of Duluth, 93 Minn. 206, 100 N.W. 1102; O'Brien v. American Bridge Co., 110 Minn. 364, 125 N.W. 1012, 32 L.R.A.,N.S., 980, 136 Am.St.Rep. 503.

■ In view of the substantial evidence contained in the record in support of these findings, we cannot brush aside the jury's verdict and accept defendant's theories and reasoning as to the manner in which the accident may have happened. All inferences which reasonably may be drawn from the evidence must be determined in plaintiff's favor, and it is elementary that the weight of the contradicted evidence and the credibility of the witnesses are questions for the determination of the jury. But the defendant urges that the evidence, as a matter of law, is insufficient to sustain the verdict because plaintiff was not occupying a normal and customary position at the place furnished him by the defendant at the time of the accident; that is, it is defendant's position that plaintiff's leaning against the railing necessarily defeats recovery in that he used the railing for an unintended purpose.

■ That it was necessary and proper for plaintiff to be on the walkway in giving signals to the engineer is not seriously controverted. The rules of the defendant required him to locate himself so that his signals could be plainly seen. The timber running parallel to the walkway had bolts protruding from its upper side some two or three inches in height, and obviously did not provide a safe place to stand or walk, and while the walkway afforded the only safe and convenient place for the plaintiff to stand in the performance

of his duties, it was only 2 feet 10 inches in width. The distance from the nearest rail to the inner edge of the walkway was approximately three feet. The overhang of an ordinary boxcar is 2 feet 6 inches from the rail, and a pile driver is somewhat wider than the ordinary boxcar. These measurements and distances strikingly portray the narrow space allotted to the train crew using the walkway at the time the work train was moving on this bridge. It seems reasonable, therefore, that, in the ordinary and normal performance of such duties, one would naturally stand in close proximity to the railing. On this particular day, other employees were also using the walkway, and so that there would be room for them to pass, it was nothing unusual for plaintiff to station himself where he did. The entire train crew, including the plaintiff, assumed and had the right to believe that the railings were safe and secure. The defendant emphasizes the fact that it was not necessary for the plaintiff to give any signal at the particular moment when the accident occurred, in that the train was stationary as long as the pile driver was engaged in driving the piles, but notwithstanding this fact it was plaintiff's duty to be ready and alert at all times for any situation that might require an immediate signal to the engineer. The duty to exercise reasonable care in furnishing a safe place to work did not pertain to any particular area on this walkway. As stated in Kenmont Coal Co. v. Patton, 6 Cir., 268 F. 334, 336, "Defendant's duty with respect to furnishing decedent a safe place to work was not necessarily confined to the precise spot in which decedent was to work." So, whether plaintiff was actually engaged at the time in giving signals seems unimportant when it is recognized that his duty was continuous, and that, in the reasonable performance thereof, it was necessary and proper for him to remain on the walkway. But does plaintiff's admission that he was leaning against the railing bar his right to recovery herein? The evidence indicates that employees of the train crew during similar operations frequently leaned or lounged against a railing of this kind. The very limited area in which they were obliged to work and pass one another would tend to induce such position. Plaintiff merely did that which other employees did under similar circumstances. His own immediate superior assumed a similar position just prior to the accident. The evidence does not indicate that he subjected the railing to an extraordinary strain, nor was the position he maintained or assumed one which was inherently dangerous. The danger arose because of the defective and worn-out fence rail, the condition of which plaintiff was not informed or aware. Such conduct could not be held, as a matter of law, such a departure or abandonment of a safe place to work provided by the employer so as to relieve it from liability on account of a negligently and carelessly constructed and maintained guardrail. Clearly, therefore, it was for the jury to determine whether plaintiff, in carrying on his work on the day of the accident, assumed any position in leaning or lounging against the rail which was contrary to the usual and customary practice. Moreover, the departure, if any, from the usual and customary practice would not be a complete defense, but would merely constitute contributory negligence. Terminal Ry. Ass'n of St. Louis v. Farris, 8 Cir., 69 F.2d 779; Norfolk & W. R. Co. v. Riggs, 6 Cir., 98 F.2d 612; Rocco v. Lehigh Valley R. Co., 288 U.S. 275, 53 S.Ct. 343, 77 L.Ed. 743. The question of plaintiff's contributory negligence was properly submitted to the jury, and the negligence, if any, of plaintiff in assuming the position he did under the circumstances, if the same contributed to the accident, would not defeat recovery under the Federal Employers' Liability Act. In passing, it may be noted that it is not reasonable to assume that the railing on this bridge was erected for the sole purpose of notifying the trainmen that it merely designated the outer edge of the walkway. If that were its only object, the most insecure and defective guardrail would have sufficed. If defendant's position is sound, the results of the guardrail's succumbing to the brush of a sleeve or a passing touch would simply be the trainmen's own misfortune. Such protection would indeed be nothing more than a deception and a trap. The very limitation of space afforded the trainmen for walking or standing on the bridge walk necessarily required reasonable precaution in maintaining an adequate and safe guardrail. In conforming to this duty, the defendant was required to do so with knowledge of the manner in which its employees generally, customarily and normally carried on the duties assigned to them. Swinson v. Chicago, St. P., M. & O. Ry. Co., 294 U.S. 529,

55 S.Ct. 517, 79 L.Ed. 1041, 96 A.L.R. 1136; Langlois v. City of Cohoes, 58 Hun 226, 11 N.Y.S. 908.

■ The contention is made that the bridge was under construction, and that therefore defendant did not owe the duty of reasonable care when it was engaged in making the bridge safe. It is asserted that plaintiff was generally engaged in work of such a character that conditions were constantly changing and that this relieved the defendant of the duty to make the place safe. Davis v. Souder, 134 Va. 356, 114 S.E. 605; Smith v. United States, 5 Cir., 96 F.2d 976; Armour v. Hahn, 111 U.S. 313, 4 S.Ct. 433, 28 L.Ed. 440. But while the principle of law advanced is generally well recognized, it has no application to the instant situation. This bridge was not undergoing any general reconstruction at the time of the accident. The crew were merely engaged in driving piles and the remainder of the bridge was not subject to general repair or reconstruction. The gates were installed to facilitate the driving of piles. Some stringers or ties had been removed, presumably for the same purpose. However, it fairly appears that the defendant intended that the guardrail should be secure and all of the workmen assumed that it was in a safe and sound condition. The trains of the defendant were using the bridge as usual. After the piles had been put in place, it was intended to go forward with the other items of reconstruction, but the time of such future work was indefinite. The putting in of the piles did not render the bridge unsafe for any of the usual and customary purposes for which the trainmen generally used the bridge in performing their duties. Plaintiff had no duty in connection with the repairs of the bridge. He had no duty with respect to the safety of the bridge or the railing. His only duty referred to that which devolved upon him as a brakeman attached to this particular train. See Roberts v. Southern Ry. Co., 151 Va. 815, 144 S.E. 863, 867, 145 S.E. 255, which distinguishes the earlier decision of Davis v. Souder, supra, and wherein the court stated:

"The defendant further contends that it did not owe the duty of reasonable and ordinary care to the plaintiff because he assumed the risk of employment; that he was employed to repair an unsafe bridge; that the character of the place for safety was constantly changing as the work progressed; and that he was engaged to make the bridge safe that had become unsafe—citing numerous cases as authority to sustain its position, among others Chesapeake & O. Ry. Co. v. Hoffman, 109 Va. 44, 63 S.E. 432; Davis v. Souder, 134 Va. 356, 362, 114 S.E. 605.

"The rule of law set forth therein is well established. But it is not applicable to this case. The conditions of this bridge were not constantly changing as the work progressed. The plan for its renewal was to replace the timbers without rendering the bridge unsafe. The whole trend of the defendant's evidence was that the method of renewal was customarily and reasonably safe—and to such extent was this carried that the bridge was left open for traffic."

■ There is no need for an extended discussion of what constitutes proximate cause. Obviously, if plaintiff was sitting on the guardrail and lost his balance, no negligence could be established, and the defects of the construction or repair or maintenance of the railing would not be the proximate cause of the accident. The court so instructed the jury. But the manner in which plaintiff was standing or leaning against the railing, and whether it was on the new or old guardrail, were questions for the jury. The timbers introduced in evidence were claimed by defendant to be those which broke loose when plaintiff grabbed the railing upon losing his balance. However, the plaintiff contends that the timbers produced were a part of the guardrail against which he was leaning and which gave way. If the jury believed the evidence in support of plaintiff's position and accepted his explanation as to the manner in which the accident happened, they were amply justified in finding that the defective and worn-out railing was the proximate cause of the accident. The testimony of witnesses Scamp and Hannum tended to support the plaintiff, and it was for the jury to decide which explanation was the most plausible and reasonable.

In the opening statement to the jury, plaintiff's counsel stated:

"The railroad company claims in this case that the accident was the fault of Mr. Boles. Now, so far as that claim is concerned, and I might say further that the railroad company in this case denies liability, and they ask for a judgment against

the plaintiff for their costs and disbursements in their answer.

"Mr. Rietz: Now, just a moment, that is objected to as highly improper.

"Mr. DeParcq: Well, I can read the answer.

"Mr. Rietz: The answer has nothing to do with it at all.

"Mr. DeParcq: You saw it and you signed it. You signed that answer. That is what it alleges here. I will read it so there will be no question about it, I can read it.

"Mr. Rietz: I have made an objection to that.

"The Court: I will examine the answer myself.

"Mr. Rietz: That is immaterial and not part of the issue here.

"The Court: I think there is no impropriety in stating the contents of this answer.

"Mr. Rietz: Exception."

■ Defendant now asserts that the statement made by plaintiff's counsel with reference to defendant's demand for costs and disbursements from the plaintiff was highly inflammatory and prejudicial. It would seem that the statement referred to was made in a casual way and merely assumed to summarize the defendant's position as set forth in its answer. We see nothing improper in this. See Hork v. Minneapolis Street Ry. Co., 193 Minn. 366, 258 N.W. 576. Numerous other errors are predicated with respect to the reception and rejection of evidence, but most of them do not require any extended comment, nor would they justify a reversal. Reference may be made, however, to the alleged error in the admission of certain testimony regarding plaintiff's family. Plaintiff's counsel propounded the following questions:

"Q. How old a man are you? A. 48.

"Q. When were you 48 years old? A. Last April.

"Q. That is on April 24th? A. Yes, sir.

"Q. 1940? A. Right.

"Are you a married man? A. Yes.

"Mr. Rietz: That is objected to as immaterial and prejudicial. ,

"The Court: The answer may stand.

"Q. Do you reside with your wife and family? A. Yes.

"Mr. Rietz: Same objection.

"The Court: I think there was an answer before the objection was entered and the answer may stand.

"Q. Do you have a family? A. Yes, sir.

"Mr. Rietz: That is objected to. Let me get my objection in.

"The Court: Do not answer the question until an objection is entered, if there is an effort made to make an objection.

"Mr. Rietz: I object to that as immaterial and prejudicial.

"Mr. DeParcq: It is proper to show that the witness or the plaintiff is married or has a family.

"The Court: I think perhaps the matter should not be pursued further."

■ The admission of testimony showing family responsibilities has been held error in many well-considered cases. Pennsylvania Company v. Roy, 102 U.S. 451, 459, 26 L.Ed. 141; Chesapeake & Ohio Ry. Co. v. Stojanowski, 2 Cir., 191 F. 720; Lacorazza v. Cantalupo, 2 Cir., 210 F. 875; Southern Pacific Co. v. Ralston, 10 Cir., 67 F.2d 958; Bahr v. Northern P. Ry. Co., 101 Minn. 314, 112 N.W. 267. However, in the instant situation, plaintiff's counsel proceeded no further in pressing this particular line of questioning. We have no reason to question his good faith in assuming that it was proper to ask the questions above enumerated. There was no attempt at this time to bring forth any details as to the number of children, their ages, or any additional circumstances which might tend to arouse sympathy for the plaintiff in the minds of the jury. "Whether the admission of such testimony is reversible error largely depends on whether it has created passion and prejudice in the minds of the jury." Chicago & North Western Ry. Co. v. Kelly, 8 Cir., 74 F.2d 31, 35. Furthermore, later on in the trial, defendant's counsel offered a statement given by plaintiff to one of defendant's claim agents in which it appeared that plaintiff was married and had two children, ages 9 and 11. This statement was read in its entirety to the jury by defendant's counsel. Consequently, it will be noted that the details regarding plaintiff's family which might have aroused sympathy or created passion or prejudice were called to the jury's attention by the defendant and not by the plaintiff. Furthermore, in the final argument to the jury, defendant's counsel referred to the fact that

the defendant company had advanced $200 to the plaintiff "to support his family in July." There was, however, during plaintiff's argument, certain reference made to plaintiff's being in a hospital with a broken back and that he had a wife and family. Thereupon, the following took place:

"Mr. Rietz: I want to take an exception to counsel's statement that he has a wife and family.

"Mr. DeParcq: It is in your own statement here. As shown by their own statement taken by their claim agent, I will read that portion of it, 'I have two children, girls, ages 9 and 11. I am 48 years old and married.'"

No exception was taken to the answering remarks of counsel, or his reading from the statement. However, the defendant contends that plaintiff's counsel was guilty of misconduct in making any reference to plaintiff's wife and family during the argument. The circumstances surrounding the advancement of this money by the defendant to plaintiff while he was in the hospital, which were referred to by defendant's counsel in his argument to the jury, and their relation to certain statements obtained from the plaintiff, gave rise to a very heated controversy. It appears that some three statements regarding the manner in which this accident happened were obtained. In two of these statements, plaintiff merely stated that he was leaning against the railing immediately prior to the accident. In one obtained by the claim agent, it appears that in one place the word "sitting" was used instead of the word "leaning". Plaintiff contended that he did not observe that the claim agent had written the word "sitting" and that other portions of the same statement refer to his position as "leaning" rather than "sitting". All of which in the argument was suggested by the plaintiff as convincing that he was not aware when he signed the statement that the word "sitting" had been written therein. In the portion of the argument which is now referred to as constituting misconduct of counsel, plaintiff's counsel was endeavoring to demonstrate to the jury that plaintiff was in the hospital with a broken back, worried about his family and finances; that he needed money, which he contends the claim agent had agreed to advance to him and for these reasons did not take as much care as he should have in observing the language that the claim agent had written in the statement. At no time did defendant's counsel request that the court instruct the jury to disregard any and all references that had been made to plaintiff's family.

We do not desire to depart from the principles adhered to and set forth in Chicago & North Western Ry. Co. v. Kelly, supra, but as stated in that case (page 35 of 74 F.2d): "* * * Courts should exercise great caution in setting aside judgments because of inadvertent remarks made by litigants or counsel during a hotly contested trial, even though improper, unless it clearly appears that they aroused the sympathy or prejudice of the jury and influenced the verdict."

This case is not, in our opinion, a close one on liability. No contention is made that the damages were excessive. It is difficult for us to believe that counsel's reference to plaintiff's having a wife and family and being in the hospital, in so far as it had a bearing on the statements signed by him, created any prejudice in the minds of the jury when all such information had been repeatedly called to their attention during the trial. Nor should it be claimed that plaintiff's counsel was injecting inflammatory and prejudicial argument to the jury in this regard when it appears that, only a short time before, defendant's counsel in his argument emphasized that the company had paid plaintiff some $200 for the support of his family. All references to plaintiff's family were immaterial and unwarranted, but they were injected into the case by both counsel. Under different circumstances, the argument referred to might well justify a reversal, but, for the reasons indicated, we do not believe the jury were improperly influenced or that any prejudice arose thereby.

Error is predicated on other alleged improper and prejudicial remarks in the closing argument of plaintiff's counsel, but no exception to such remarks was taken by the defendant either during the argument or at its close. As stated in United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 238, 60 S.Ct. 811, 851, 84 L.Ed. 1129: "* * * In the first place, counsel for the defense cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the comments to the jury were improper and prejudicial."

The approved practice in this circuit has been set forth with great care

and exactness in London Guarantee & Accident Co. v. Woelfle, 8 .Cir., 83 F.2d 325. It will be noted from this case that counsel must either make an objection or take an exception or move for a mistrial at the time of the alleged misconduct, or where it involves a closing argument, counsel may, and preferably should, make his objection, take his exception, or ask for remedial action at the close thereof and before the case is submitted to the jury. As stated by Judge Sanborn in that opinion (83 F.2d at page 344): "In the future, to secure from this court, as a matter of right, a reversal of a judgment because of improper remarks of counsel in an argument made to a jury, the bill of exceptions must contain all arguments in full and must show, either that adequate objections and exceptions to rulings thereon were taken during the argument complained of, or that such remarks were specifically excepted to at the close of the argument."

A consideration of the entire record impels the view that this verdict should not be disturbed by reason of the claimed misconduct of counsel, in absence of a strict compliance with the admonitions stated above.

 Criticism is directed to the following statement in the court's charge: "As I understand the evidence in this case, the timbers, Exhibits 7, 8 and 9 came from the railing where the plaintiff fell from the bridge." The exhibits referred to were the three timbers produced by the defendant. An exception was taken to this statement by the court. However, it seems reasonably clear that, in making this statement, the court did not assume to infer to the jury that these were the timbers which gave way when plaintiff leaned against them, as distinguished from defendant's theory that these timbers gave way when plaintiff grabbed them upon losing his balance. The exhibits did come from the railing where plaintiff fell from the bridge, and whether they broke away from the railing because he leaned against them or because he grabbed them upon losing his balance was a question that the court left for the jury to determine. The court made it clear that, if plaintiff was sitting on the railing and lost his balance, he was not entitled to recover.

 This case was tried under the Federal Employers' Liability Act on the theory that the defendant had failed to provide plaintiff with a safe place to work. Defendant recognizes that this claim of negligence was properly an issue in the case and that it owed plaintiff the duty to exercise reasonable care in furnishing him with a reasonably safe place to work, but it asserts that the court erred in not instructing the jury in this regard in the particular manner and in the same language as it requested. However, the court did instruct the jury in effect, at least, that it was the duty of the defendant to provide plaintiff with a reasonably safe place to work, and if it failed to exercise reasonable care in so doing, it was negligent. The charge differed from the requested instructions as submitted by the defendant, but the language used by the court fairly expounded the theory upon which defendant sought to have the case submitted to the jury. The court stated in part: "If you find from the evidence in this case that the plaintiff was not engaged in the performance of his duties in the usual and customary manner, or that there was not a defect in the material or construction of the railing mentioned in the evidence and that it was reasonably safe for the employees of the defendant in the performance of their duties, or if you find that the railing was not reasonably safe because of a defect in the material or construction, and, yet, that such defect was not the proximate cause of the plaintiff's injuries, in whole or in part, then your verdict should be for the defendant."

The requested instructions were fairly covered by the general charge. See Chicago & North Western Ry. Co. v. Kelly, 8 Cir., 84 F.2d 569, 573. The court's charge as a whole correctly stated the applicable law in a fair and impartial manner. The other errors assigned regarding the charge have been disposed of by what has already been stated.

Finding no reversible error in the record, it follows that the judgment appealed from should be, and is, affirmed.