## Kroger Grocery and Baking Company v. Hamlin.

(Decided December 2, 1921.)

### Appeal from Kenton Circuit Court (Common Law and Equity Division).

1. Malicious Prosecution—Threats—Duress—Burden of Proof.—In a malicious prosecution suit, the finding of the jury that the written confession of plaintiff's guilt of the offense for which she was prosecuted was obtained by threats and duress, as testified to by her, is flagrantly against the evidence, since the burden was upon her to establish the fact, and her testimony is unnatural, unreasonable and improbable and is denied by three witnesses and many circumstances which overwhelmingly disprove her version of the matter.

2. Malicious Prosecution—Advice of Counsel—Probable Cause.—The advice of counsel sufficient to create probable cause for the prosecution in such cases must be given upon a free, full and fair presentation of all the facts by defendant, and the attorney must be a competent and disinterested one; but, the interest which would disqualify him or render his advice ineffectual must be something more than that which arises from his employment by defendant;

it should be a financial interest or one growing out of relationship to some of the parties or which springs from enmity or legal bias against plaintiff, or some other sufficiently legal cause that would render it improbable that good faith advice would be given, and when the facts render it necessary to submit the question of the interest of consulted counsel the term "disinterested" should be defined after the manner above indicated according to the character of interest which the evidence tends to show.

3. Trial—Argument and Conduct of Counsel.—Attorneys should not be allowed to inject either directly or indirectly misleading matters in the record. They should only indulge in a fair investigation of the facts relative to the issues involved, and a verdict which, colorably at least, was obtained by such foreign and misleading matters should not be allowed to stand.

ROBT. C. SIMMONS and GORDON, MERRILL & GINTER for appellant.

B. F. GRAZIANI for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

This action was filed in the Kenton circuit court by appellee, plaintiff below, against appellant, defendant below, to recover damages claimed to have been sustained as a result of an alleged malicious prosecution, which was instituted on July 11, 1918, by defendant against plaintiff, wherein she was charged with converting to her own use, goods, property and merchandise of defendant, on June 19, 1918, and at divers times prior thereto for a period of three months. Upon a trial in the police court of the city of Covington, on the warrant which issued on the affidavit, plaintiff was discharged. She filed her petition on August 24 thereafter, laying her damages at $2,995.00, and in it she made the necessary allegations to make out that character of suit, except she failed to aver that the prosecution was without probable cause, which omission was corrected by an amendment filed before the submission of the case to the jury. The answer was a denial, and it also affirmatively alleged that defendant had probable cause to believe the plaintiff guilty of the offense charged, and relied on the advice of counsel, which affirmative pleas were unnecessary, since evidence of the facts alleged was admissible under the general denials of the answer. Elmer v. Fox, 172 Ky. 290. Appropriate pleadings made the issues and upon trial there was a verdict in favor of plaintiff for $1,250.00, upon which judgment was rendered, to reverse which defendant prosecutes this appeal.

Various errors are urged as grounds for a reversal, some of which we consider immaterial and which we will not discuss in this opinion, but others we deem of sufficient materiality to authorize a reversal of the judgment, and they will be considered as briefly as possible.

Defendant operated a number of retail stores, some of which were located in Covington, and plaintiff had worked in one or more of those stores as its employe. She was assistant cashier in one of them at the time of the prosecution complained of. There was a rule of the company, well known to plaintiff, that no employe could purchase goods from the store in which they were working without paying for them before taking the goods therefrom, and that a ticket should be made of the purchase accompanied by a check in payment therefor. These rules, it is explained, were adopted to protect the company, not only against accumulation of accounts by employes but also to prevent them from obtaining goods without paying therefor, or without making any record thereof. At the store where plaintiff was working there was found a shortage in the stock of something like $1,750.00, and there was no record to show what had produced it. At about six o'clock on the evening of June 19, 1918, three of defendant's employes appeared at the store where plaintiff worked and saw her and the superintendent locking the door preparatory to leaving and plaintiff had a sack or bundle of goods, which afterwards proved to be some eggs and canned milk. She and the superintendent were approached and defendant's agents inquired of her if she had paid for the goods, or had otherwise complied with the rules of the company, and she acknowledged she had not, but she stated that she expected to make payment in the future, although no record of the purchases had been made. The parties went back into the store and while in there plaintiff wrote and signed this statement: "I am thoroughly familiar with all the Kroger Company's rules and have wilfully disobeyed them." She says that there was no threat or coercion of any kind to induce her to write and sign that statement. Defendant's agents, conceiving that the storeroom was not an appropriate place to discuss matters, inquired of plaintiff if she would go to the office of the company across the river in Cincinnati, Ohio, which she readily consented to do, and one of them carried her in an automobile to that place, followed shortly afterwards by the superintendent and

the other two agents.   They went into the office and there is quite a contradiction between plaintiff's testimony and defendant's witnesses as to what occurred there.   She says, in substance, that defendant's agents wrongfully accused her of appropriating as much as $100.00 worth of goods from the store at which she was working, and that they threatened to send her to the penitentiary and to the jail, and to keep her up all night if she did not sign the paper acknowledging the wrongful appropriation of as much as $100.00 worth of goods, and that they presented to her such a paper with the request that she sign it which she, in her frightened condition, declined to do.   She says that they then reduced the amount of her peculations to $75.00, and upon her declining to sign it, it was reduced to $50.00, then to $25.00, and finally when they reduced the amount to $8.00 she agreed to and did sign the paper, and it is in these words:   "I, Christine Hamlin, hereby confess that I have taken goods to the amount of $8.00, the property of the Kroger Grocery and Baking Co.   I further confess that Mr. Bankemper, the meat cutter at 3633 DeCoursey avenue, South Covington, Ky., has exchanged meats for groceries with the grocery manager, Mr. Oxley, (at a store at which she had formerly worked) about three times a week for five weeks.   Said grocery manager, Mr. Oxley, has taken goods, the property of the above mentioned company, five times without paying for same to the extent of $5.00.   I also confess that Miss Ethel Plaggenborg, cashier at Fortieth and DeCoursey, has taken goods, the property of the Kroger Grocery and Baking Company, to the extent of $3.00.   I make this confession of my own free will, without threat or promise."

After signing that paper, she was asked if she would return to the office the next morning and make a statement as to what she knew of the wrongful appropriation of goods by the superintendent of the store at which she then worked, and she agreed to do so.   She was given car fare by one of defendant's agents and returned home about ten o'clock, and reported at the Cincinnati office, as she had agreed to do, the next morning between seven and eight o'clock.   She then consented to and did go to the office of defendant's attorney in Cincinnati, and made a statement concerning peculations by her immediate superintendent, which she had agreed to do; and in it she accused him of having wrongfully appropriated as much as $300.00 worth of goods belonging to defendant, and which amount it appears from the record he acknowl-

edged to be true. She was then told to report the next morning at one of the stores in Covington for work, which she did, and worked that morning as cashier in that store but did not return in the afternoon, but did do so the next morning and worked until about eleven o'clock, when, according to her evidence, she suddenly conceived the notion that she had been greatly abused, humiliated, and maltreated on the night of the conference in the Cincinnati office, and without notifying her superintendent or any one else she quit the service. Her own statement about her quitting is "I just thought it over, I didn't want to have people that treated me so mean, I just thought I would quit." That was on the 22nd day of June, 1918, and on the same day she applied to her attorney, who prepared for her a petition against defendant to recover $2,999.00 damages because of the treatment she received in defendant's office in Cincinnati; though the petition was verified on the 22nd day of June it was not filed until the 25th. She also filed another suit against defendant to recover damages for the alleged libel contained in the affidavit made to procure the warrant involved in this case. There are many other unreasonable, improbable and unnatural statements found in her testimony as to what occurred in the Cincinnati office, and which we have not time nor space to incorporate here.

On the other hand, the three agents of defendant, one of whom was an officer in the United States Army at the time of the trial, testified that none of the things related by plaintiff occurred at the Cincinnati office. Their testimony, in substance, is that plaintiff freely and voluntarily stated at that time the amount of goods, as well as she could recollect, that she had taken from the store contrary to the rules of the company as well as that taken by some other employes; that no threats of imprisonment or even prosecution were made to her, nor was she in any wise insulted or intimidated; that she was perfectly composed and when she departed she borrowed car fare from one of them, and agreed to and did return the next morning for the purpose hereinbefore stated.

The superintendent of the building in which the Cincinnati office was located testified that he passed it on the night plaintiff was there at least ten times and the door leading into the hall was open, which contradicts plaintiff who says that it was shut and locked. Immediately adjoining the office was another one in which there was

conducted a school for moving picture actors and actresses, and some eighteen or twenty persons were there on that night, some of whom were parents of the participants, and plaintiff neither appealed to nor made any effort to reach any of them to relieve herself of her alleged imprisonment. The superintendent under whom she was working was in the office at the time, and he was neither introduced nor offered to be introduced by her to substantiate her testimony.

Manifestly, if the statement, which plaintiff signed in the Cincinnati office, was freely executed (and she admits knowledge of its contents when she signed it), there would be no doubt of the existence of probable cause for instituting the prosecution of which she complains. It behooved her, therefore, to impeach that writing by showing that it was procured by duress through threats and other intimidating acts on the part of defendant's agents, and that it was not on that account her free and voluntary act. It was as essential to her cause of action that she should impeach that writing as that she should prove the unsuccessful prosecution, and, if the verdict of the jury, which necessarily found the writing to be so tainted, is flagrantly against the evidence on that issue the verdict should be set aside.

In the light of the testimony in the record, and of the proven circumstances, we are forced to the conclusion that the verdict on that issue is flagrantly against the evidence. We not only have the testimony of plaintiff contradicted by three unimpeached witnesses whose testimony shows them to be intelligent, and their evidence fairly and conservatively given, but there are a number of circumstances going to show that plaintiff's version as to what happened at the Cincinnati office was both unreasonable and unnatural, and, therefore, improbable. Her testimony, itself, is inherently so, and the fact that she consented to and did return to the office on the next morning is another circumstance out of harmony with her version of what occurred. If she had been so grossly mistreated on the night before she would scarcely have voluntarily returned the next morning and freely made another statement concerning other employes of defendant. Surely, such treatment called for complaint to some one and would have created a righteous indignation that would have deterred her from returning, alone, to the office the next morning. Again, human nature would revolt at the idea of again entering the service of one so

inconsiderate of the feelings as well as the reputation of its employes. Still again, if plaintiff's theory be true, when confronted with three witnesses to the contrary, she would have made some effort to substantiate her testimony by that of her former superintendent who was in the office at the time. Her action in returning to the office the next morning and in accepting employment by defendants thereafter were not only contradicting circumstances of her testimony, but they also corroborate that of defendant's witnesses, since they would then harmonize with gentle treatment to which they testified. It was explained that the reason why she was again employed was that the investigation concerning the stores at which she worked was not completed, and the preservation of harmony was desired until that was done, which we think is a reasonable explanation.

Plaintiff's agents testified that they went to Hon. R. G. Williams, an attorney in Covington, who was formerly Commonwealth's attorney of that district, and stated to him all of the facts as hereinbefore recited. He testified likewise, and advised the agent who made the affidavit that there were reasonable grounds for the prosecution. The attorney had represented defendant in some former litigation and was representing it at the time in another suit filed by plaintiff against it.

The court instructed the jury that if they "shall further believe from the evidence that before the institution of the prosecution the defendant, or its agents, consulted a disinterested, competent attorney for advice as to whether or not a prosecution would be warranted, and fully and fairly disclosed to him all the facts," etc., and that he advised an institution of the prosecution, and defendant's agent in good faith relied on such advice, they would find for defendant. Complaint is made of the use of the word "disinterested" in the instruction, under the facts proven in this case. It is true that the consulted attorney, as has been sometimes stated by this court, must not only be a competent one but also *disinterested.* (Smith v. Fields, 139 Ky. 6, and Emler v. Fox, *supra*). But, surely, the fact that he represented defendant in other litigation would not render him *interested,* within the meaning of the law, so as to disqualify him from giving advice. If that were true, then perhaps no attorney could be consulted except the Commonwealth or county attorney whose duties are to prosecute offenders, for any other attorney would have the right to charge for the

very advice sought, and in that sense would be an employed one. Rather are we disposed to hold that the *disinterestedness*, which would disqualify the attorney, should grow out of the fact that he was financially interested in the outcome, or that he was related to the parties, or that he was so biased because of enmity against the accused, or some other equally substantial reason, from giving good faith advice. At any rate, the matter should not be left with the jury to determine what would create such disqualifying interest, since they might conclude that former employment, or friendship, or intimate association, or some other similar reason would be sufficient for the purpose. In this case no defining instruction was asked and we are therefore without authority to disturb the judgment, under a well established rule of appellate practice, for the failure to do so; but we refer to it only that the correction may be made on another trial.

It is also complained that counsel for plaintiff during the trial indulged in many remarks and some conduct, by repeating excluded questions and otherwise, which were wholly foreign to the case and greatly disparaging to the rights of defendant. Such conduct and remarks were sometimes made in an effort to introduce clearly irrelevant testimony, an example of which was, that prior to the prosecution the defendant had demanded of one of its former employes, which counsel designated as a "detective," but who, in fact, was only an inspector, and had no connection with the instant case, "to turn up something or lose his job," and in response to an objection counsel stated, presumably in the presence of the jury, that, "The purpose is to show that they have a detective agency, to extort money, make people pay money, or deed them property or give them money. Have these detectives, including Mr. Carroll and these people under the guise of superintendents, and use force upon these clerks from time to time, like they have Tunis. They make them pay a lot of money over." Clearly, such conduct is without defense, and its only effect was to prejudice the minds of the jury and to cause it to return a verdict, not based on relevant and competent testimony, but as a product of a poisoned mind. The only comment we deem necessary to make is to repeat what we said in the case of Jones v. Commonwealth, 191 Ky. 485, that "The chief purpose in the conduct of trials is, or should be, to see that justice, as near as may be, shall prevail. This

can never be accomplished by the injection of misleading matters into the record, either directly or indirectly; for the temple of justice has for its sole foundation, and is built upon truth, and it is upon this alone that all the law of the country, both civil and criminal, is erected. Attorneys are officers of the court and constitute as much a part of its machinery for administering right and justice in the conduct of trials as does his honor upon the bench, and it would certainly be an unheard of proceeding for the latter to engage in an effort to create a false impression upon the minds of that part of the judicial machinery whose duty it is to pass upon the facts. Cases are not wanting where similar conduct of counsel has been held prejudicial, even to the extent of authorizing a reversal of the judgment. L. & N. R. R. Co. v. Payne, 133 Ky. 539; Shields, Admr. v. Rowland, 151 Ky. 136, and Baker v. Commonwealth, 184 Ky. 207.'' Without holding that the matters now under consideration were in themselves sufficient to authorize a reversal it is sufficient to say that the court upon another trial will see to it that they do not occur.

It is further insisted, in view of the fact that the plaintiff claims no special damages and that she was not arrested, but summoned only, and that she made only two trips to the court, that the verdict is excessive, but since a new trial must be granted for other causes, we refrain from a determination of that question the one way or the other.

Wherefore the judgment is reversed with directions to set it aside and grant a new trial and for further proceedings consistent herewith.