## CHICAGO, ST. P., M. & O. RY. CO. v. HENKEL.

### No. 9089.

Circuit Court of Appeals, Eighth Circuit.
Aug. 24, 1931.

Rehearing Denied Oct. 14, 1931.

Alfred E. Rietz, of St. Paul, Minn. (William T. Faricy and Warren Newcome, both of St. Paul, Minn., on the brief), for appellant.

Robert J. McDonald, of Minneapolis, Minn. (William A. Tautges and B. W. Wilder, both of Minneapolis, Minn., on the brief), for appellee.

Before KENYON and BOOTH, Circuit Judges, and DEWEY, District Judge.

BOOTH, Circuit Judge.

This is an appeal by defendant from a judgment after verdict in an action brought by appellee to recover damages on account of the death of her husband, Carl E. P. Henkel, which was alleged to have been caused by the negligence of appellant.

Henkel, at the time of his death, was in the employ of appellant as head brakeman on one of its freight trains, and was riding in the cab of the locomotive which was derailed by a washout. At the time of the accident, Henkel and defendant were both engaged in interstate commerce. The action was brought under the Federal Employers' Liability Act (45 USCA §§ 51–59).

Among the items of negligence relied upon by plaintiff were: (1) Failure on the part of the defendant to use due care in the maintenance of its roadbed and track at the place of the accident, resulting in a washout and a wreck of the train upon which Henkel was employed; (2) failure on the part of the defendant to use due care in inspecting said roadbed and track just prior to the accident.

The main defenses relied on by the defendant were: (1) Denial of negligence; (2) that the rain which caused the washout was an act of God.

Eighty-two assignments of error were filed; on this appeal reliance is had upon forty-six of them. These numerous assignments of error may, however, be grouped under a few topics, and it is to these topics that our discussion will be mainly confined:

First. Insufficiency of the evidence to establish negligence (1) as to the maintenance of the roadbed and track; (2) as to the inspection of the same.

There was substantial evidence tending to establish the following facts: Defendant owned and operated a steam railroad extending from Omaha, Neb., northerly to Sioux City, Iowa, passing en route through Blair, Tekamah, and Emerson, Neb. The wreck and derailment of defendants' train occurred between 3 and 4 miles north of Tekamah. Blair is 24 miles north of Omaha; Tekamah is 17 miles north of Blair; and Emerson 93 miles north of Omaha. Blair and Emerson were open stations on the night in question where trains could receive and send orders. The track was a single one, over which defendant operated four passenger trains and seven or eight freight trains daily. Defendant's train No. 20 left Omaha about or shortly after midnight July 13, 1929, destined for Sioux City, Iowa, in charge of Conductor McPherrin. It consisted of 23 cars, engine, and caboose. Kent was engineer, Denton was fireman, Cotter was rear brakeman, and Henkel, deceased, was the head brakeman. After leaving Omaha, Blair was the first stop. The conductor there received orders to run as an extra to Emerson with superior rights over No. 19, a south-bound train proceeding from Sioux City, Iowa, to Omaha, Neb. Being an extra, this train was not required to follow the schedule time of train No. 20. After leaving Blair, no stops were made until about 2:35 a. m. on the morning of July 14, 1929, at a point approximately 4 miles north of Tekamah, Neb., and about 1,200 feet south of a crossing known as Matthews crossing, when the engine ran into a washout and turned over on its side, and Henkel was caught underneath the tank, and as a result thereof was killed.

Tekamah creek originates about three miles north of Matthews crossing and flows south through Tekamah. The creek is about 150 feet west of defendant's track at Matthews crossing. At this crossing, a public highway crosses the track from the east to the west; and, continuing westerly, joins another road which crosses the creek.

The grade of the track at Matthews crossing slopes downward toward the south to a point several hundred feet south of the place of the accident.

The roadbed between Matthews crossing and a point south of the place of the accident was composed of cinders and gravel.

On the easterly side of the railroad, and both to the north and south of Matthews crossing, lies the Jensen farm. This farm consists of 320 acres, one-half of which is on the east side of defendant's track, and about 140 acres of this land is under cultivation. The Jensen house is located about 100 feet east of Matthews crossing, and about 50 feet south of the highway crossing. On the east side of the track, the farm extends about 40 rods north of Matthews crossing, and extends south to a point about 120 rods south of Matthews crossing. Most of the 160 acres on the east side of the track slope toward the track, and the land is hilly. Just east of Matthews crossing for a distance of about 60 rods the hills are somewhat steep.

There were three culverts in this vicinity extending under defendant's track to drain water from the east to the west toward the creek. The most northerly was culvert No. 162⅜, which was located about 30 feet north of Matthews crossing; 1,430 feet south of that culvert was culvert No. 162½; and 305 feet south of that culvert was culvert No. 163. About 95 acres of the Jensen land east of the railroad drain towards these culverts and Matthews crossing; about 19 acres of this drain towards Matthews crossing; about 2½ acres drain towards the track south of Matthews crossing; and about 74 acres drain towards culverts No. 162½ and No. 163. The bulk of the water draining from the large watershed of 74 acres approaches the railroad track at the place where a flat spot is located at a point approximately 250 feet north of culvert No. 162½, where it forms a pool and then runs south off the flat spot to culvert No. 162½. In a light rainfall, 90 per cent. of the water from the 74-acre watershed would reach the east railroad fence at a point approximately 250 feet north of culvert No. 162½, and 10 per cent. of the water would flow directly to culvert No. 163 from the hills; and during a heavy rainfall, more than 1 inch of rain per hour, 75 per cent. of the water would reach the east railroad fence at a point 250 feet north of culvert No. 162½, and 25 per cent. of the water would flow directly to culvert No. 163 from the hills.

After the water reaches the flat spot about 250 feet north of culvert No. 162½, it could not get to culvert No. 163 without a ditch; but if there was a proper ditch or

proper approach to culvert No. 162½, that that culvert was of sufficient size and capacity to carry a run-off of water from 100 acres if the rain should fall at the rate of 1 inch per hour. To permit culvert No. 163 to flow full, there would have to be a ditch from a point 250 feet north of culvert No. 162½ extending to culvert No. 163, which ditch would have to be 12 to 15 feet top width and 5 or 6 feet deep; and if there was no ditch between culverts No. 162½ and No. 163, water from the flat spot could not get to culvert No. 163; and, in the absence of such a ditch, rainfalls would affect the track at the point where the washout occurred.

The soil on the Jensen farm is of clay and silt, and during rains the ground would scour toward the railroad track, and after rains deposits of silt, corn cobs, and the like would be deposited on the flat spot from the Jensen field extending out to the track, for a distance of about 300 feet north of culvert No. 162½. The east end of culvert No. 162½ was 1 to 2 feet below the ties and was down in a hole. The water draining toward Matthews crossing would flow on the highway westerly over defendant's track and would empty into Tekamah creek about 150 feet west of the track. Débris would wash down with the drainage water and such débris would be deposited at the crossing in the spaces between rail and planking.

About a week before the accident, under the direction of the roadmaster, for the purpose of giving the track proper drainage, the bulldozer—a grader—did some ditching work on the east side of the track, commencing at Matthews crossing and proceeding south for a distance of about 200 feet. No ditch was dug and no work was done by the bulldozer between the flat spot, located approximately 250 feet north of culvert No. 162½, and culvert No. 163.

A day or two after the bulldozer did the work on the east side of the track, defendant's roadmaster, without consulting the engineering department, ordered the section crew to dig a ditch just south of the public highway, at Matthews crossing, and parallel therewith, extending from the east toward the track and connecting with the ditch dug by the bulldozer, so that the water draining from the Jensen land east of Matthews crossing toward the crossing would be prevented from flowing over the crossing, as it previously had done, but so that such water would flow into such diversion ditch and then empty into the ditch dug by the bulldozer and flow south on the east side of the track toward culvert No. 162½. The diversion ditch dug by the section crew was about 65 feet long and about 3 feet wide, and it was shallow at the east end and deepest at the west end, having a fall of approximately 2 feet; and the ditch would carry about 15 or 20 cubic feet of water per second.

From Matthews crossing south to culvert No. 162½, the land on the right of way east of the track was grown up with weeds, and between Matthews crossing and the flat spot north of culvert No. 162½ there were large hemp weeds; and at the east end of culvert No. 162½, in addition to weeds, there were cornstalks and débris that had washed in; and the level land between culverts No. 162½ and No. 163 was also grown up with weeds. Any work done in previous years by defendant between Matthews crossing and culvert No. 163 on the east side of the track, either in the digging of ditches or the disturbance of ground, had all been filled in by the accumulation of soil and débris that from time to time had washed down from the ground east of the track; so that, at the time of the wreck, there was no ditch on the east side of the track between culvert No. 163 and a point 250 feet north of culvert No. 162½.

Shortly after the accident, in the morning of July 14, 1929, it was observed that there was not much water draining through culvert No. 163. In culvert No. 162½, water was flowing, but the culvert was only flowing about one-third full, because there were big hemp weeds and cornstalks and other débris choking up the culvert. The big washout was located north of culvert No. 162½, about in the center of the flat spot north of the culvert, at which point the roadbed was washed out and the water was flowing through the opening from the east to the west. Some of the water coming from the fields on the east side of the track was flowing north to the washout north of culvert No. 162½; water was flowing south from Matthews crossing; and, at the flat spot where the washout was located, there were dirt, cinders, and cornstalks deposited, and the flat spot was covered with water 3 to 4 inches deep. At the washout, the water was flowing from the east to the west under the track rather fast, and cornstalks and other débris were flowing through the washout. All of the water previously flowing toward Matthews crossing from that part of the Jensen farm east of the crossing and south of the road was going into the diversion ditch and then flowing south on the east side of the track, and the diversion ditch was running about full; the water was running fast, and

the dirt that had been scattered around at the point where the diversion ditch had been dug, and where the bulldozer had done the work, had been washed down to the south of Matthews crossing. The weeds and cornstalks had stuffed up the east end of culvert No. 162½. The water flowing south of Matthews crossing towards culvert No. 162½ on the east side of the track flowed very fast until it reached the flat spot north of such culvert, and at that place the water slowed up; and at this flat spot north of culvert No. 162½, water coming from the east was flowing on the flat spot out toward the track where the wreck had occurred, and this water coming from the east over the flat spot met the water coming south from Matthews crossing on the east side of the track.

The wreck occurred about in the center of the flat spot north of culvert No. 162½. The washout was about 40 or 50 feet long, and the engine was just north of the washout.

Immediately to the east of the point where the washout occurred, and north of culvert No. 162½, after the accident there was an accumulation of dirt and débris of considerable depth.

Heavy rains of like character with the one preceding this accident were not unknown in this vicinity, and, at such times of heavy rains, Tekamah creek frequently overflowed its banks.

The official record of rainfall in inches at Tekamah included the following: The fall of rain on July 14, 1929 (the rain which caused the washout in question), was 4.71; the rain of October 12, 1928, was 4.75; the rain of August 13, 1910, was 5.01; the rain of June 13, 1899, was 5.00; the rain of May 7, 1892, was 6.20. On forty-two occasions between March 27, 1890, and July 14, 1929, inclusive, rain fell in excess of 2 inches at Tekamah.

Prior washouts had occurred within the preceding ten or twelve years at points a little north of Matthews crossing and at points not far from the place of the accident.

The evidence as to many of the foregoing facts was sharply contradicted. We are clearly of the opinion, however, that there was substantial evidence to go to the jury on the question of negligence in connection with the maintenance of the railroad track and roadbed.

▇ Second. As to inspection, there was substantial evidence tending to establish the following additional facts: The train left Omaha about midnight and arrived at Blair a little late, at about 1:25 a. m.; the train remained at Blair for about 25 minutes, where a car was set out and one or two cars were picked up. This train running extra out of Blair left there at 1:50 a. m., and no stops were made by the train between Blair and the point of the accident. The train went through Tekamah at about 2:20 a. m., and shortly thereafter it went by the tile factory, about 3 miles north of Tekamah, at a speed of about 18 miles an hour; the accident occurred at about 2:35 a. m. south of Matthews crossing while the train was going up grade at a speed of 12 to 18 miles an hour. Between Blair and the point of the accident, the conductor was sitting in the caboose. He first knew of the accident when a jolt occurred and the train went into emergency. In the caboose was a conductor's valve, which would permit the conductor to stop the train if he so desired, as he had a right to do as conductor.

The rain started shortly after leaving Omaha. Heavy showers and occasional thunder and lightning were encountered between Omaha and Blair. Because of rain encountered at Blair, both the conductor and the rear brakeman put on their rubber hip boots, and, after leaving Blair, neither took them off because they wanted to have them on when doing their next work at Oakland; and, when the train went through Tekamah, it was raining.

H. H. Hamblin, a witness, lived in a house 10 feet from the banks of Tekamah creek, located about 6 blocks from the depot at Tekamah. He retired about 9:00 p. m. and slept on a sleeping porch facing the creek. At 1:00 a. m. he was awakened by the noise of the water and smell of the creek, at which time it was raining quite hard. The smell indicated to him that the creek was rising, and he looked out at the creek and saw it was about half full and was rising. He was the local weather observer and paid particular attention to the rainfall.

D. C. Sutherland, a witness who lived at Tekamah, retired about midnight, but got up about 1:30 a. m. to close a window because of loud thunder, and he observed a steady light rain between 1 and 2 o'clock a. m., and the thunder and lightning were so severe that he was unable to sleep, so he got up and dressed at 2 o'clock for the purpose of going down to his newspaper office located near Tekamah creek so as to remove stock from the basement, which he thought might be damaged because of the rain. When he got down to the newspaper office at 2:15 or 2:20

a. m., Tekamah creek was then rising and the water was coming slightly into the basement.

James Taylor, a witness who was employed as night watchman at Tekamah to watch Tekamah creek, found that the creek was rising at 1:30 a. m.; that it was raining hard in Tekamah at 2:00 a. m.; that at that time there were 6 inches of water in part of the basement of Sutherland's newspaper office that came in from the creek; the water was in the basement of this building before the train went through.

Fred C. Hale, a witness who worked and resided at the tile plant which is located about 3 miles north of Tekamah and about ¾ of a mile south of Matthews crossing, testified that the rain started between 11:45 and 12:00 p. m., and that, prior to the time the rain started, he noticed the lightning and heard the thunder. Shortly after the rain started, the hard rain came, and he remained up and awake until 4:00 a. m., at which time he went to bed; and during all of that time it would rain hard, then slack up for a little while, and then rain hard again, accompanied by thunder and lightning. The rain was the same between 12:00 and 1:00 as it was between 2:00 and 4:00.

Raymond Hale, a witness who lived at the tile plant, came home between 11:45 and 12:00 for the purpose of going to work at the tile plant where he was fireman. As he came home, it started to rain about 10 minutes to 12, and it continued to rain until 4:00 a. m., raining hard for a while, then light, and then hard again. He noticed Tekamah creek rising, and at 2:00 a. m. it had overflowed its banks at the tile plant.

Chris Jensen, a witness who lived in a house 100 feet from Matthews crossing on the east side of the track, was at Tekamah on the night of July 13th and arrived home at about 11:00 p. m., at which time he went to bed. When leaving Tekamah at about 10:00 p. m. for his home, it was sprinkling, and while going home, it continued to sprinkle, and there was lightning and thunder. He was awakened about 11:45 p. m., at which time it was raining hard, and there was lightning and thunder. He remained awake until 2:00 a. m., and the thunder and lightning continued; and during that time it would rain hard, then slack up, and then rain hard again.

James A. Barger, a witness, defendant's section foreman, who lived at Tekamah in a house facing the railroad track, about 150 feet distant, was awakened about 2:00 a. m. by his wife, and he got up and dressed for the purpose of going out to patrol the track, if necessary. Joe Sublet, a witness, a section hand, lived at Barger's home and he also got up shortly after 2:00 o'clock for the purpose of going out with Barger to patrol the track north of Tekamah.

The purpose of patrolling the track during heavy rains was to determine whether or not it was safe for trains to pass over the track.

When the section foreman got up, he looked out of the door and saw it was raining, and he dressed and put on all his clothes with the exception of his shoes, and then he sat down in a chair in the parlor of his home for a period of about fifteen or twenty minutes; and, while he was putting on his shoes, he heard train No. 20 go through Tekamah.

There was testimony that the section foreman had admitted that, when train No. 20 went through Tekamah, he and a section man were in the house where the motorcar was kept, trying to start the motorcar. The section foreman denied this.

There was substantial evidence that it was customary, in rainy weather, for the section men to patrol and inspect the track in section 13, which included the place of the accident. The section foreman and his men did patrol and inspect the track from Tekamah to Matthews crossing shortly after the train in question had passed through, and of course discovered the wreck.

It was admitted that no patrol and inspection of the track took place on the night of July 13th prior to the accident.

Although the question is a close one, yet, in view of the evidence thus outlined and other evidence of similar character, we think the question of negligence relative to inspection of the track and roadbed before the passage of train No. 20 was one for the jury.

█ Third. It is contended by defendant that the evidence shows conclusively that the storm which caused the accident was of an unprecedented character and constituted an act of God.

We think the contention cannot be sustained.

The court fairly instructed the jury as to the meaning of the expression "act of God," and further instructed that, if the accident was caused by an act of God as the sole proximate cause, the verdict must be for the defendant.

In view of the evidence, we think defendant received as liberal treatment in respect to

this question as was warranted. Gleeson v. Virginia Mid. R. Co., 140 U. S. 435, 11 S. Ct. 859, 35 L. Ed. 458; So. Pac. Co. v. Schoer, 114 F. 466, 57 L. R. A. 707 (C. C. A. 8); United States v. Kansas City Southern Ry. Co. (D. C.) 189 F. 471; Eikland v. Casey (C. C. A.) 266 F. 821, 12 A. L. R. 179.

Fourth. It is further contended by appellant that, even though failure to inspect the track and roadbed could be held to be negligence, yet the evidence does not show that such negligence was the proximate cause of the accident.

We cannot agree with this contention.

If ordinary care required the section foreman and his men to make an inspection of the track and roadbed between Tekamah and Matthews crossing after this rain commenced and before the passage of a train over that part of the road, it would seem to follow that such ordinary care would include the stopping of trains or warning them while such inspection was going on, in order that the inspection might not be futile.

We think the jury was justified in finding, in view of the evidence, that, if such ordinary care had been taken, the accident would not have happened; but that failure to exercise such care was a contributing cause of the accident.

Fifth. Error is predicated by appellant upon the admission in evidence of the statement of the conductor of the train several hours after the accident that "It was raining hard when we went through Tekamah, and we should have stopped, and sent the section crew out ahead of us."

Assuming that the admission of this statement in evidence was error, yet shortly thereafter it was stricken out and the court forthwith instructed the jury as follows: "The jury will not consider it, and should determine this case as if that evidence had never gone in. And I do now rule it out, and instruct the jury not to consider that evidence. I should not have let it in before as part of the res gestae or otherwise. The jury should try this case and determine it as if that evidence had never been admitted here, as if they had never heard it. It should not influence the verdict in any way, shape or form, and I so instruct the jury." We think the error, if any, was cured by this emphatic instruction.

Sixth. Error is also predicated by appellant upon the admission in evidence of certain rules of the railroad company touching the conduct of conductors and enginemen; and track foremen and trackmen. It is contended that these rules required a higher degree of care of the employees mentioned than the law required, and that the jury was, therefore, given a wrong impression.

We think there could have been no misapprehension on the part of the jury. The rules were allowed to be introduced for a limited purpose stated by the court at the time of their introduction. In the charge to the jury, the court clearly stated and reiterated that the care required of the defendant was ordinary care only.

Other contentions of appellant have been examined and considered, but do not require discussion.

Our conclusion is that there was substantial evidence to support the verdict and judgment, and that no reversible error is disclosed by the record.

The judgment is affirmed.