**CHICAGO, B. & Q. R. CO. v. KELLEY.**
No. 10020.

Circuit Court of Appeals, Eighth Circuit.
Nov. 14, 1934.

J. W. Weingarten, of Omaha, Neb. (W. P. Loomis, of Omaha, Neb., J. C. James, of Chicago, Ill., and A. C. Scott, of Denver, Colo., on the brief), for appellant.

Donald Gallagher, of Lincoln, Neb., for appellee.

Before GARDNER, SANBORN, and WOODROUGH, Circuit Judges.

GARDNER, Circuit Judge.

This is an action brought by appellee as administratrix of the estate of George H. Kelley, deceased, to recover damages for death by wrongful act, under the provisions of the Federal Employers' Liability Act (U. S. C. title 45, §§ 51–59 [45 USCA §§ 51–59]). There was a verdict for $20,600 in favor of the appellee, and, from the judgment entered thereon, this appeal has been taken.

We shall refer to the parties as they appeared in the lower court.

Plaintiff's intestate, George H. Kelley, at the time of the accident resulting in his death, was forty-five years of age, had had sixteen years' experience as a brakeman and conductor, and was at that time in the employ of defendant as a brakeman, engaged in interstate commerce. The accident in which Kelley met his death happened at Juniata, Neb., September 2, 1933, while a unit of three freight cars was being set out. The freight train on which deceased was working had arrived at Juniata from the east, and stopped at a point on the main track east

of the east switch. The railroad tracks there extend east and west, the main track running north of the depot, and the industrial track south of the depot. The switch used on this occasion to reach the industrial track from the main line is between 500 and 600 feet east of the depot. The industrial track is used for loading and unloading freight cars at the stockyards, oil rack, elevator, and coalyard. A graveled highway, 28 or 30 feet in width, crosses both the main track and the industrial track at right angles just east of the depot. The train crew desired to set out on this industrial track a tank car and two empty stock cars. These cars were the first three cars of the train, immediately following the engine.

As the train was stopped east of the switch, this cut of three cars was uncoupled from the rest of the train, which was left standing on the main track. By use of the movement known as a "flying switch," the three cars were diverted onto the industrial track; the engine remaining on the main track. The cars coasted down the industrial track about 500 feet; the last car just crossing the highway. The tank car was in the lead, and the two stock cars followed. Conductor Abbott and Brakeman Kelley rode the three cars as they coasted down the industrial track, and in the meantime the engine backed up east, again crossing the switch, which was then reopened so that the engine might go in on the industrial track to spot the stock cars at the loading chute and the tank car at the unloading spout. It was the intention of the crew, in conformity with the usual practice, in making this coupling, to stop the engine near the three cars, adjust the couplers and drawbars for coupling, then move the engine so as to contact the cars and make the coupling, and move them to the locations desired. This same crew, including Kelley, had done such work in this manner many times at Juniata, and at other like stations. Kelley and his co-workers understood what was to be done and how it was to be done.

As the engine moved down the industrial track, with the bell ringing, the engineer worked steam for about three or four lengths of the engine after entering the industrial track, then shut off the steam so that the engine coasted, traveling, according to estimates of witnesses, at about four to eight miles an hour. Brakeman Hood, Engineer Probasco, and Fireman Stevens were all on the engine. Contrary to expectation and to the usual practice, the engine did not stop before it came in contact with the cars. Kelley was

standing on the north side of the tank car about 4 feet from the east end of the car, and, when the impact came, it threw him from the car to the track. The cars were moved west by the impact some 40 to 50 feet. Three sets of car wheels passed over Kelley, killing him instantly.

After the accident, it was found that the brakes on the tank car were set. The surviving members of the crew did not set them, and the inference is that they were set by Kelley. Before the impact, the engineer set both straight and automatic brakes and sanded the rails about 20 feet from the cars. The brakes held the wheels so that they slid along the rails 15 to 18 feet, but failed to stop the engine before it crashed into the closed coupler on the east car. As these cars were passing down the industrial track, the conductor stepped off, near the east side of the highway crossing, and walked to the depot, about 80 feet, to give the agent the waybills for these cars, and he had just arrived at the door of the depot when he heard the impact of the engine against the cars. There was testimony that it would take about twenty-six seconds to walk the distance covered by the conductor. When he stepped off the cars, they were moving slowly, and he observed Kelley on the stock car as it passed him. During the time the conductor walked to the depot, Kelley must have gotten down off the stock car onto the tank car, and set the brakes before the impact.

Weeds were growing on the roadbed, both inside and outside the rails, and the wind, which was blowing from the south, blew these growing weeds over the tops of the rails. When the engine stopped, following the impact, its gangway, which is the space between the engine and the tender, was in the center of the graveled highway crossing. Kelley and the crew had set cars out on this same track several times within the two weeks preceding the accident, and Kelley had spoken to Conductor Abbott about the growing weeds blowing over the top of the rails, and Abbott had told him the only thing for him to do was to be careful. In the growing season it was not unusual for weeds and vegetation to grow around and between the rails on these side tracks.

In switching movements, such as the one under consideration, it was customary for some one to ride the cars while they were moving, so that they could be stopped. The testimony is in conflict as to whether or not it was unusual for an engine to slide 15 to 18 feet in attempting to stop.

Deceased left surviving him a widow and four children; the children being aged 13, 16, 18, and 19, respectively.

At the close of the evidence, defendant moved for a directed verdict, which motion was denied, and the case was sent to the jury on the following issues of alleged negligence: (1) That the engineer failed to keep the locomotive under proper control; (2) that the locomotive was driven and crashed into the three cars with great force and violence, causing the cars to jerk and move suddenly; (3) that the locomotive was driven and crashed into the cars without any signal or warning to Kelley; (4) that defendant's tracks were overgrown with weeds, which it well knew, or in the exercise of reasonable care should have known; that they were slippery and afforded little or no traction for the wheels of the locomotive because of the freshly crushed weeds thereon, which caused the wheels of the locomotive to slide on the rails, and contributed to the crash of the locomotive into the three cars.

On this appeal it is contended that: (1) There was no proof of actionable negligence; (2) the decedent's death resulted from one of the ordinary risks of his employment, which he assumed; (3) the court erred in its instructions to the jury, fixing the value of the pecuniary loss to the beneficiaries as the present value of the wages deceased would have earned had he survived; (4) the court erred in instructing the jury that a recovery might be had for loss to children after they attained their majority, there being no evidence of reasonable expectation of such support; (5) counsel for plaintiff was guilty of improper conduct, to the prejudice of defendant; (6) the court erred in denying defendant's motion for a directed verdict.

■ To warrant 'recovery under the Federal Employers' Liability Act (45 USCA §§ 51–59), there must have been negligence causing or contributing to the injury .or death. Seaboard Air Line v. Horton, 233 U. S. 492, 34 S. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475; New York C. R. Co. v. Ambrose, 280 U. S. 486, 50 S. Ct. 198, 74 L. Ed. 562; Atchison, T. & S. F. Ry. Co. v. Toops, 281 U. S. 351, 50 S. Ct. 281, 74 L. Ed. 896; Atchison, T. & S. F. Ry. Co. v. Saxon, 284 U. S. 458, 52 S. Ct. 229, 76 L. Ed. 397.

■■ In reviewing the action of the court in denying defendant's motion for a directed verdict, it is not the province of the court to weigh the evidence, but to examine it only for the purpose of determining whether there

was substantial evidence to sustain the verdict, and, in considering the evidence for that purpose, the testimony in favor of the appellee must be accepted as true, and appellee is also entitled to such reasonable favorable inferences as may fairly be drawn therefrom. Where the evidence so considered is of a character that reasonable men may reach different conclusions, the case is one for the jury. Illinois Power & Light Co. v. Hurley (C. C. A. 8) 49 F.(2d) 681; Philadelphia Storage Battery Co. v. Kelley-How-Thomson Co. (C. C. A. 8) 64 F.(2d) 834; C., M., St. P. & P. R. Co. v. Linehan (C. C. A. 8) 66 F.(2d) 373.

■ It appears here that weeds had been permitted to grow up on the roadbed on which the industrial track was located, so that the tops of them were above the rails. This condition was known to the engineer in charge of the engine. In this condition of the track, the engine approached these cars for the purpose of making a coupling. Brakeman Hood was on the gangway, ready to step off onto the ground when the engine stopped and open the knuckles so that the engine in contacting the car might make the coupling. It was the duty of this brakeman, in the usual course of a movement of this sort, to control the movement in making the coupling, and the engineer ordinarily does not drive his engine into a car to make a coupling, without a signal from the brakeman who is riding on the engine, and who is usually given an opportunity to step off and open the knuckles so that the coupling can be made. In the instant case, however, the engine did not stop as was customary, and as the evidence shows was expected. The three cars upon which Kelley was working had just cleared the gravel highway crossing when the locomotive came over the crossing and struck the east car.

Engineer Pearson, called on behalf of plaintiff, testified that it was unusual in making couplings for the engine to slide 15 to 18 feet on the rails into the cars to which the coupling was to be made. The track just east of the graveled highway is slightly up grade, but west of the highway it is level. Pearson testified: "The force of an ordinary coupling which failed to make would not necessarily move two stock cars and an oil car on a level track at all. It would be unusual to move them forty or fifty feet, and if they were moved forty or fifty feet it would indicate that the engine had hit them with more than ordinary force."

Engineer Frickey, called on behalf of plaintiff, testified: "It is unusual for an engine to slide fifteen to eighteen feet on a rail into a car with which coupling is to be made unless some condition caused the engine to slide. It might be various things that caused that. It does not ordinarily happen. I don't believe in my experience that I have ever known of an engine sliding fifteen to eighteen feet into a car to make a coupling."

There was other testimony of similar import. There was evidence from which the jury might well have believed that the engine was not handled in the customary manner, and that it did an unusual and unexpected thing. That it may have slid on weeds east of the highway is indicated by the testimony, but its wheels went over part of the graveled highway crossing, and then hit the three cars with such force as to move them a distance of 40 to 50 feet with the brakes set on the oil car, and with such force as to throw Kelley from the car under the wheels. There were no weeds on the rails on the highway crossing, so that, if the weeds caused the engine to slip or slide, that condition was not present on the highway crossing, and from the evidence it seems fairly clear that the drive wheels of the engine must have traveled at least halfway across this highway.

■ Conceding that the engine slid on the rails because of the moisture and sap from the weeds, defendant argues that the heavy growth of weeds was a usual condition on such tracks, and hence no negligence in that regard was shown. Whether or not permitting weeds to accumulate on the tracks to such an extent as to come between the wheels of the engine and the top of the rails, and thus cause the powerful and heavy locomotive to slide, was negligence, under the facts and circumstances in this case, was a jury question. Chicago, St. P., M. & O. R. Co. v. Henkel (C. C. A. 8) 52 F.(2d) 313. Deceased had called this matter to the attention of the conductor some time before, and the evidence indicates that the condition was recognized as one of some danger. We think, too, that the evidence with reference to the handling of the engine was such as to warrant the jury in finding that the engineer was negligent. Louisville & N. R. Co. v. Summerlin (C. C. A. 5) 18 F.(2d) 950. It was, therefore, not error to deny defendant's motion for a directed verdict, and there was substantial evidence of actionable negligence.

84

■ It is, however, urged that the accident resulting in Kelley's death arose from one of the ordinary risks of his employment, and hence was assumed by him. This defense is available in an action of this sort. As said by us in Wheelock v. Freiwald, 66 F.(2d) 694, 698: "The defense of assumption of risk is available under the Federal Employers' Liability Act [45 USCA §§ 51–59]. The risks assumed by an employee are those ordinarily incident to the discharge of his duty in the particular employment, and also those not ordinarily so incident, but of which he has actual or constructive knowledge, with full appreciation of the danger that may flow therefrom."

■ The issue was submitted to the jury by a proper instruction, but it is the contention of defendant that under the undisputed evidence deceased assumed the risk, and hence the issue was not a jury one. We are of the view that the deceased assumed the risk arising from the slipping of the engine on the rails, caused by the presence of the growing weeds, but the weeds did not extend into the graveled highway crossing, and it cannot be said that the accident was caused solely by the presence of the weeds. As has already been observed, there was evidence of negligence in operating the engine, and Kelley did not assume the risk arising from such negligence, unless it was such as he should have foreseen. Reed v. Director General, 258 U. S. 92, 42 S. Ct. 191, 66 L. Ed. 480; Portland Terminal Co. v. Jarvis (C. C. A. 1) 227 F. 8.

■ In instructing the jury as to the measure of damages, the court said: "In fixing the amount of your verdict you should allow only the present cash value of the total pecuniary loss. That is, you should not allow the total sum which the deceased would have earned during the time he would probably have lived, but only the present worth thereof, to be determined by deducting, from the total amount which deceased might have earned, interest at a rate which a reasonably prudent and careful person, under circumstances of time and place, might be expected to obtain in making a safe investment. In other words, you should discount each monthly or yearly payment of wages which deceased might have earned had he lived for a period of time from the date of the death to the time when the money would have been earned and paid and at a reasonable rate of interest, and then allow interest on the sum arrived at from the date of death to the present at 6%."

The defendant excepted to this instruction in the following words:

"The defendant excepts to that part of the instruction and charge which tells the jury that they may allow the plaintiff for the amount of the present value of the amount that George Kelley would have earned had he lived—that was the impression I got from the statement—

"The Court: If there is any construction of that kind to be placed on it I do not believe it is warranted. I do not want any error—

"Mr. Weingarten: I was excepting to the charge as I understood it."

Damages recoverable in actions for death by wrongful act are such pecuniary benefits as the beneficiaries reasonably might have received had the deceased not died from his injuries. Michigan Cent. R. Co. v. Vreeland, 227 U. S. 59, 33 S. Ct. 192, 57 L. Ed. 417, Ann. Cas. 1914C, 176; Gulf, C. & S. F. Ry. Co. v. McGinnis, 228 U. S. 173, 33 S. Ct. 426, 57 L. Ed. 785; Norfolk & W. R. Co. v. Holbrook, 235 U. S. 625, 35 S. Ct. 143, 59 L. Ed. 392; Chesapeake & O. R. Co. v. Kelly, 241 U. S. 485, 36 S. Ct. 630, 60 L. Ed. 1117. The vice of the instruction is that it does not limit the jury to the actual pecuniary loss of the beneficiaries, but permits a recovery based on what the deceased might have earned. Kansas City Southern R. Co. v. Leslie, 238 U. S. 599, 35 S. Ct. 844, 59 L. Ed. 1478; Nashville, C. & St. L. Ry. Co. v. Anderson, 134 Tenn. 666, 185 S. W. 677, L. R. A. 1918C, 1115, Ann. Cas. 1917D, 902.

After defendant had noted an exception to the questioned instruction, the court said: "Very well. Gentlemen of the jury, counsel on either side, under the practice in this court, has a perfect right to call the court's attention to any errors the court may have made in the statement of the law, that the jury may be properly advised. You have listened to the exceptions of counsel on both sides and I am now satisfied that the law as given you is a correct statement of the law and the exceptions are properly noted."

■ It seems clear that the jury must have understood that the court reaffirmed what he had said in the instruction with reference to the measure of damages. The court said: "I am now satisfied that the law as given you is a correct statement of the law." This emphasized, rather than cured, the error. Where the court has given an erroneous instruction, it may be withdrawn or explained by the court so as to remove error which other-

wise might be present. But the withdrawal must leave no doubt in the minds of the jury as to what the court ultimately declares the law to be. As said in Louisville & N. R. Co. v. Johnson (C. C. A. 7) 81 F. 679, 681: "When it is proposed by a further instruction to correct an erroneous charge, the purpose should be stated, and the explanation made so clear as to leave no room for reasonable mistake."

See, also, Patterson Transfer Co. v. Schlugleit (C. C. A. 6) 252 F. 359.

We think this instruction did not fairly submit to the jury the proper measure of damages.

The court also instructed the jury that, if they found in favor of plaintiff, it would be their duty to "fix the amount of her recovery and in doing so you may allow her, in your verdict, for the use and benefit of herself, as wife, and her minor children, such sum as in your judgment, under the proof, will be just compensation for the pecuniary loss they have sustained by reason of the death of the deceased. In estimating such sum you should consider the age of the deceased, together with his capacity for earning money, his disposition to contribute, to care for, and to furnish his wife money, as shown by the evidence, the ages of the children and the probable expectation of life of the parties concerned." It is contended that this instruction permitted the jury to award damages on account of contributions which they believed the deceased might have made, had he lived, to the children after they had attained their majority. Proper exceptions were taken to the instruction, calling it to the attention of the court.

There was no evidence from which the jury could have found any expectation of support for the children after majority. The instruction does not clearly limit the recovery for them to minority, but the last part of the instruction permits consideration of the ages of the children and their probable expectation of life. Right of recovery for these beneficiaries was limited to their minority, and the court should have so instructed. Chesapeake & O. R. Co. v. Kelly, 241 U. S. 485, 36 S. Ct. 630, 60 L. Ed. 1117; Hines, Director General, v. Walker (Tex. Civ. App.) 225 S. W. 837; Nashville, C. & St. L. Ry. Co. v. Anderson, 134 Tenn. 666, 185 S. W. 677, L. R. A. 1918C, 1115, Ann. Cas. 1917D, 902.

It is urged that counsel for plaintiff was guilty of such misconduct as to entitle defendant to a reversal of the judgment. As has already been observed, the evidence established that weeds and vegetation were growing along and between the rails of the industrial track. This vegetation was blown over the rails and crushed by the wheels of the engine, so that the engine slid as it passed over the weeds. Counsel for plaintiff attempted to show that after the accident the vegetation along this track was removed. Counsel, in interrogating the witness Abbott, said:

"Q. What I want to find out is were there weeds taken off this track, if you know, a short time after Mr. Kelley was killed?"

To this question, counsel for defendant interposed the following objection:

"Object to that as incompetent, irrelevant and immaterial and not proper cross-examination and highly prejudicial and improper.

"The Court: Sustained.

"Mr. Weingarten: And I ask the court to instruct the jury to disregard the conduct of counsel in that respect and disregard any inferences as to that matter.

"The Court: The court instructs the jury that any reference to any change in the situation there after the accident has no bearing on the matters here and the jury should not take it into consideration here in arriving at a verdict as to this accident here."

Evidence that after the accident the defendant made changes or repairs, or adopted some different method or system of handling its cars, was, as the court held, inadmissible. Motey v. Pickle Marble & Granite Co. (C. C. A. 8) 74 F. 155; Atchison, T. & S. F. R. Co. v. Parker (C. C. A. 8) 55 F. 595; Davidson S. S. Co. v. United States (C. C. A. 8) 142 F. 315.

Notwithstanding the ruling of the court that the evidence was improper, counsel, in cross-examining the witness Hawe, interrogated him as follows:

"Q. After Mr. Kelley was killed on September 2nd you issued an order for them to take the weeds off that track?

"Mr. Weingarten: Object to that as improper cross-examination and highly prejudicial conduct on the part of counsel and we except to it and object to it.

"The Court: Objection sustained. It is highly improper, under the law, and the jury will disregard anything that happened out there after the accident, and that will not be allowed."

Counsel for the defendant took exception to this as misconduct of counsel, and

the exception was allowed. The conduct was highly improper and reprehensible. After the court had sustained an objection to a similar interrogatory, and had admonished the jury to disregard any inference that might arise therefrom, there could be no reasonable explanation or excuse for again asking such a question. 3 Wigmore on Evidence (2d Ed.) § 1808; Stewart v. Brune (C. C. A. 8) 179 F. 350; Sherlock v. Dinneen, 45 S. D. 246, 186 N. W. 958; Johnson v. Jensen, 118 Neb. 1, 223 N. W. 637; Kroger Grocery & Baking Co. v. Hamlin, 193 Ky. 116, 235 S. W. 4. The asking of the second question could scarcely have been in good faith, and its manifest purpose was to prejudice the jury. The mere putting of a question which conveys to the jury improper information, and which tends to render the trial unfair, should ordinarily entitle the opposing party to a new trial. Standing alone, we should hesitate to grant a new trial for this misconduct because the court took great care in admonishing the jury to disregard these questions and any inferences that might arise therefrom, but it must be understood that the conduct was highly improper and wholly unwarranted.

Certain rulings of the court in admitting testimony are urged as erroneous, but it seems unlikely that the same questions will arise on a retrial of the action, and hence we pretermit considering them on this appeal.

The judgment appealed from is therefore reversed, and the cause remanded, with directions to grant the defendant a new trial.