### TERMINAL R. ASS'N OF ST. LOUIS v. FARRIS.

#### No. 9783.

Circuit Court of Appeals, Eighth Circuit.
March 6, 1934.

Rehearing Denied April 7, 1934.

S. Mayner Wallace, of St. Louis, Mo. (T. M. Pierce, J. L. Howell, and Walter N. Davis, all of St. Louis, Mo., on the brief), for appellant.

John S. Marsalek, of St. Louis, Mo. (Mark D. Eagleton and Allen, Moser & Marsalek, all of St. Louis, Mo., on the brief), for appellee.

Before GARDNER, WOODROUGH, and BOOTH, Circuit Judges.

WOODROUGH, Circuit Judge.

Appellee, as administratrix of the estate of her deceased husband, filed this suit to recover for his death under the Federal Employers' Liability Act, 45 USCA § 52. The deceased was in the employ of appellant and it is alleged in the petition and was shown by the evidence that both he and appellant were engaged in interstate commerce at the time of the accident. There was a trial before the court and a jury which resulted in a verdict in favor of the appellee in the sum of $30,-838. Thereafter, the damages awarded by the jury were reduced by remittitur to $20,000 and judgment was entered for that amount. From said judgment the appellant duly perfected this appeal, presenting by proper assignments of error that the trial court erred in refusing to direct a verdict in its favor on the theory that the evidence was insufficient

to show causal negligence on appellant's part; that the deceased's injury was due to his failure to follow appellant's rules; that the court erred in the charge to the jury on the issue of negligence; and further that the verdict was the result of passion and prejudice.

The suit was tried on an amended petition and answer thereto. The amended petition alleges that the appellant is a railroad corporation engaged in interstate commerce and that in its said business it used certain yards and a station known as the Union Station in the city of St. Louis, Mo., and the tracks, equipment, appurtenances, and devices connected with the operation thereof, all of which were used in the furtherance of its interstate commerce business; and that the appellant and deceased were engaged in interstate commerce at the time of the accident; that on August 21, 1931, the deceased was in the employ of the appellant and while engaged in his duties was caught and crushed between the parts of a train and so seriously injured that he died on the next day. In describing the accident the petition alleges that the Illinois Central Railroad Company, under a lease, or agreement with the appellant, was operating an interstate train upon the tracks of appellant at said Union Station and that said train was brought in contact with the train of the appellant in and about which the deceased was working, and that as a result of the collision deceased was caught and crushed between the parts of said train. The Missouri statute (section 4690, R. S. 1929 [Mo. St. Ann. § 4690, p. 2098]) rendering a railroad liable for the negligence of its lessee or licensee is pleaded in this connection.

The petition sets out ten acts of negligence on the appellant's part, for all of which it is responsible, as the cause of the collision. The first six of these allegations plead negligence with reference to the operation of the Illinois Central train in failing to give any signal or warning of its approach; in operating it at an excessive rate of speed; in failing to discover the deceased and the train of cars about which he was working; and in failing to stop or slacken the speed of the Illinois Central train so as to avoid striking the other train. The four remaining allegations of negligence are:

"7. That the defendant, its said agents and servants did negligently and carelessly order and direct the persons in charge of said Illinois Central Railroad Company's train to use the aforesaid track for the movement of said Illinois Central Railroad Company's train when said track was not clear, but which was obstructed by the train about which the plaintiff's said husband was working, as aforesaid."

"8. That the defendant, its said agents and servants did negligently and carelessly cause, suffer and permit sand to be and remain upon its rails and to thus and thereby interfere with the operation of devices, which were ordinarily used for the purpose of indicating the occupancy of a track and for preventing a train from moving upon a track when it was partly obscured or fouled by a train upon another track located nearby."

"9. That the defendant, its said agents and servants, negligently and carelessly failed and omitted to inspect said tracks or equipment and devices, or to discover the aforesaid conditions or the location of said Terminal train which was then and there so located as to obstruct the movement of said Illinois Central Railroad Company's train."

"10. That said defendant, its said agents and servants, did negligently and carelessly cause, suffer and permit said sand to be and remain upon said rails when in the exercise of ordinary care defendant could and should have removed or remedied said conditions or warned of same, in time to have prevented said movement of said train and the collision and injuries resulting therefrom."

The answer was a general denial.

At the conclusion of the evidence peremptory instruction in favor of the Terminal Company was requested, as follows: "At the close of the whole case the Court instructs the jury that under the law and the evidence the plaintiff is not entitled to recover against defendant and your verdict must be for the defendant." The request compels review of the evidence by this court and determination as to its sufficiency. Bank of Union v. Fidelity & Casualty Co. of New York (C. C. A.) 62 F.(2d) 1040, 1041.

The substance of the testimony is stated by counsel without contradiction and borne out by the record, as follows:

As to the physical situation, the evidence shows that the Union Station property consists of a train shed, to the east, referred to in the evidence as the old train shed; a number of tracks west of the old shed, referred to as the umbrella train shed, and the yard and tracks used in connection therewith. The tracks in the station run north and south. The tracks in the new part of the station, to the west of the old train shed, are indicated by letters. The two tracks principally concerned in the evidence are tracks C and D, track D being immediately west of track C.

The dead ends of all the station tracks are to the north; at the south end they are curved.

By an admission of the parties, and by the evidence of the witnesses, it was shown, without dispute, that all train movements and the operation of all devices governing train movements in the station and adjoining yard were controlled by employees of the appellant. For the control of train movements, the appellant had installed a system of electrical signals, operated by employees, by means of levers, from a tower known as tower No. 1, located four or five hundred feet south of the station. The movement of trains into and out of the station and adjoining yards was directed solely by signals sent out from the tower to the men in control of the trains. The evidence shows that the train operatives were required to and did rely implicitly upon the signals given from the tower, and received no other orders, signals, or information relative to the time they should move, or the track they should run on. A train could not move until it received a green light signal, operated from the tower. For the information of the men in the tower, operating the levers, the appellant had installed an electrical signal and interlocking switch system, which was intended to operate automatically, according to the position of the various trains in the yard and station. The tracks were divided into blocks, and each block was connected to signals in the tower by electrical wiring. Each block was on a separate circuit, and if a train was in the block, it was intended that a red signal should show in the tower, under which circumstances the tower men would not direct another train into the block. This automatic system also controlled the switches, so that theoretically it was impossible to move a train in such a manner as to conflict with another train in a block. The tracks were so wired that when a train or car was standing in a block on any track, in a position where it would foul a train running upon an adjoining track, a red signal would be shown in the tower, disclosing to the lever operator the fact that the adjoining track was not clear and locking the switches so as to close that section of the track which was fouled. The evidence showed that the men in tower No. 1 could see the tracks, at the place where the accident in question occurred, but that they did not depend upon their view of the train, in the operation of the system, but solely upon the indicators before them.

The deceased was the conductor of a crew in appellant's employ, engaged in switching trains in and about the station and adjoining yard at the time of the accident. William F. Horn was the engineer, Bon West was the fireman, and Harry Wilson was the switchman. The accident occurred at about 10:30 p. m. Previous to the accident this crew had brought in upon track D a baggage and mail car which they set in at the head or south end of a Missouri Pacific passenger train, No. 17, which was being made up on said track. The train was scheduled to leave at 11 p. m. These two cars had been pushed in by the engine, which was headed north. After attaching the cars to the Missouri Pacific train, the crew cut off their engine, moving it about four feet to the south of the cars they had brought in. The deceased went to the south end of the shed, and signaled to the tower, by means of a push button located there, that the engine was ready to move out of the track. The signal by which the crew would be notified from the tower to back their engine out of the track was located about four car lengths ahead of the engine. Farris got on the left or west end of the front footboard of the engine, and they all waited for the back-out signal from the tower. While the engine stood in this position, the Illinois Central train, consisting of a locomotive and five coaches, was backed in on track C. It was running about ten miles an hour. The rear car of the Illinois Central train struck the right (or east) rear corner of the tank of the Terminal engine, buckling the gangway between the tank and the engine, and moving the engine to the north. Deceased was pinned between the end car of the Missouri Pacific train and the front end of the engine on the left side.

It was shown by the testimony of Joseph Lordan, conductor of the Illinois Central train, and Samuel Thompson, flagman, that their train received a green signal from the tower to back in on track C. This fact was shown without dispute. In response to this signal the train, which was then at bridge 13, in the yard, was backed toward the east, and then south, following track C into the station. Lordan stood on the rear platform of the rear car, at his regular place of duty. He saw the Terminal engine and tender when he was four or five car lengths from it, but due to the sharp curvature of the track did not know that it was in a position where it would be struck. He was relying implicitly upon the signals received from the tower. He applied the brake by means of the air hose when his rear car came in contact with the tender.

Ora Garrison, lever man, employed in tower No. 1 at the time of the occurrence, testified

that he received an oral order from Vent Owens, train director, to let the Illinois Central train in on track C. He looked at the signal devices in the tower, and they showed that track C was clear. Witness set the various devices to line up the switches so that the Illinois Central train could move into the station. Sam Snow, the other lever man, at this time was getting a drink of water. Snow testified that after Garrison had everything lined up, he (Snow) operated the lever which gave the Illinois Central train the green starting signal. Snow also stated that at the time he operated the starting lever all the signal lights in the tower showed that the blocks on tracks C and D were clear.

Vent Owens, train director, stationed at tower No. 1, testified that he gave Garrison the order to let the Illinois Central train in on track C. Snow, the regular lever man in charge of that track, had at that time gone to get a drink of water. Witness knew that the Terminal engine was in on track D, and had not yet been given the signal to move out. Witness testified that if the Terminal engine was in such position as to foul a train coming in on track C, the indication light should have been out, and the switch locked. At the time witness gave the order to Garrison to let the Illinois Central train into track C, the indicators in the tower showed that track C was clear, and that there would be no collision between the trains. The indicator showed that the Terminal engine was in the clear. Witness relied implicitly on these signals. Witness testified that the various railroads that came into the station were required to use, and did use, the appellant's track, and were subject to the supervision of the appellant.

There was evidence tending to show that the failure of appellant's signaling system to work properly, and the consequent collision, was due to sand on track D; that the presence of sand on the various tracks was a frequent occurrence which was well known to the appellant and its agents, and that they were charged with knowledge that such a condition would render the signal system inoperative. There was evidence on this subject as follows:

Robert Holliday testified that he had been in the appellant's employ since 1914, as a signal maintainer. After describing the wiring of the signal and interlocking system, he testified that he had made an investigation of the signaling devices at the point where the accident occurred, and found that none of the wires were broken. He stated: "After the wrecks were cleared I made an investigation and found the track, the balls of both rails covered with sand. This would affect the operation of the signaling device by shunting them. It would shunt the track and make the signal show clear. The sand gets onto the circuit of the wire, on the ball of the rail and shorts it, shunts it out. Ordinarily with an engine standing on the rail the block would be out. That is, it would shunt the circuit out. If a sufficient amount of sand was on the rail it would throw the signal into a clear position. If no sand is on the rail and the engine comes in contact with the rail, it shunts the circuit out and shows red in the tower; that is, tower No. 1, right south of the Union Station."

Witness testified that the sand on the track which caused the shunting of the signal extended from switch 285 north to where the track circuit comes, probably 35 or 40 feet. There was sand on the wires of both rails. Switch 285 is south of the place where the accident occurred. In quantity it was just as if you took a handful and threw it on top of the rail, just sprinkled it along.

Witness testified that whenever they found an engine going through, depositing sand on the rails, they swept it up. This occurred two or three times a week, sometimes every day. Even in clear weather, if the track (train?) is heavy and they can't start, they put sand on it. Witness' duty was to look after the whole plant, tower No. 1. He looked after all the tracks, a hundred, more or less. When he saw sand on a track he got a broom and swept it off. "Q. Would you say that occurs two or three times a week, or would you say it occurs two or three times a day? A. Yes, sir." He stated: "I don't look for any sand, only when I am going on my route; if I see any on the track I get a broom and sweep it off, which is my orders." At another point in his testimony is set out: "Until such time as he is notified, he does not go around with the light looking for sand, and nobody else does. He has never been told by anyone to look for sand in advance of hearing of trouble. He never heard of a rule or custom of that kind."

Witness testified that he was familiar with the fact that sand had caused this same trouble before. When there was trouble he received notice from the tower by four blasts of the whistle. He had had calls where trains would show clear on the track in the old train shed, and go up there and find the train sitting there with some sand on the track; naturally the relay showed clear, when it should show red. Asked how long this had been going on, that is, the sand causing the track

to show clear when it should show red, how frequently that occurred, the witness answered: "More or less that way all the time, say a block shows clear with a train on it. It happened not so frequently, but different times."

William F. Horn, the engineer working with the deceased, testified that when he came in there that evening he had no occasion to use sand; that he had a good rail. He could not tell at that time of the night whether there was any sand on the rail; in pushing cars ahead he could not see it. He did not know that an engine would fail to give signals on account of sand on the track. The only instructions he had received about the use of sand was to use it only when necessary, and to be careful about using it around interlocking devices. Harry Wilson, the defendant's switchman, testified that at the time of the accident he had never heard that sand being on the track would cause this sort of an accident. He testified: "I didn't know that there was a rule that prohibited the use of sand in connection with interlocking devices." B. B. Hickman, appellant's superintendent, arrived at the scene of the accident between thirty and forty-five minutes after it occurred. He stated that the rails of track D were bent slightly; the rails of track C were not torn up; that neither the switching device nor the interlocking device were interfered with at all on either track. He did not think they were disturbed; however, he would not guarantee that. He stated: "I saw quite a good deal of sand on the track. I do not know positively what quantity of sand would be necessary to cause signals to become inoperative. A sufficient amount of sand insulates the current, and the equipment on the track does not do what it should do. In this case it permitted not only the switches to be operated, and let the Illinois Central train in on track C, but probably at the same time showed clear in the tower instead of showing out." The witness testified: "The rule we had in effect at that time was that the sand must not be used over the moving parts of the interlocking plant. That rule was put in to prevent wear of the switches and machinery. The rule did not cover the entire circuit, but covered only the moving parts of these circuits. It would not cover the place of this accident, and would not have anything to do with sand being on the track where this engine was. No one was especially assigned to the duty of inspecting tracks at any time to see whether or not sand was on the tracks at various places. I don't know of any order being issued to look out for sand on the track.

The only order I know of is the one with reference to sand not being permitted to get around the moving parts of interlocking plants. After the accident, we issued instructions not to use sand on track circuits." The witness further testified that when he reached the place of the accident he saw sand on the tracks; that it was a large quantity of sand on the rail, about as much as would stay on the rail. On either side of the rail there was some. The sand was south of the engine. The sanders were operated by the engineer from the cab. If a number of cars had passed over that sand, most of it would have been pushed off the rails. Witness could not tell how long the sand had been on there. Before the accident we had a rule to the effect that sand was not to be used on the movable parts of the interlocking plant. After the accident we issued instructions not to use sand on track circuits at any time under any circumstances.

The appellant, in accordance with its assignments of error, contends that the proof above outlined was insufficient because it is not shown therein for how long a time the sand which prevented the proper operation of the signaling devices had been upon the track, and it is not shown by any direct evidence how the sand had been deposited there. It is argued for appellant that a number of different ways may be imagined in which the sand may have gotten upon the track—as that children might have put it there, or it might have been spilled inadvertently without fault of anyone, and that it might not have been there long enough for any feasible system of inspection to have detected it. But on consideration of the evidence we conclude, as answered by counsel for appellee, that the running of trains upon the network of tracks in and about the Union Station is a complex business, dangerous to appellant's employees and others if not properly conducted, and it was encumbent upon appellant to adopt all reasonable measures to avoid subjecting its employees to unnecessary dangers. It was the duty of appellant under this rule, not only to provide safe and efficient signaling devices, as it appears to have done, but also to put into effect a reasonably safe system for safeguarding the effectiveness of the devices to do what the appellant relied upon them to do. It being shown that the presence of sand on the rails would and frequently did prevent the effective operation of the signaling devices upon which alone the safety of train movements in the yards depended, and it being further shown that in the ordinary and usual movements of the trains sand was discharged

from the engines upon the tracks, a duty necessarily devolved upon the appellant to use care to guard against the manifest danger. Whether appellant's failure to issue instructions against use of sand on the tracks in the station and yards, or its failure to provide an adequate system of inspection to avert the consequences of the practice of using sand, as it was shown to have been used, was negligence proximately contributing to the death of appellee's husband, rendering appellant liable for such death, were questions for the jury under proper instructions. New York Central R. Co. v. Marcone, 281 U. S. 345, 50 S. Ct. 294, 74 L. Ed. 892; Gunning v. Cooley, 281 U. S. 90, 50 S. Ct. 231, 74 L. Ed. 720; Baltimore & Ohio R. Co. v. Groeger, 266 U. S. 521, 45 S. Ct. 169, 69 L. Ed. 419; Texas & Pac. R. Co. v. Harvey, 228 U. S. 319, 33 S. Ct. 518, 57 L. Ed. 852; Kreigh v. Westinghouse, etc., Co., 214 U. S. 249, 29 S. Ct. 619, 53 L. Ed. 984; Gardner v. Michigan Cent. R. Co., 150 U. S. 349, 14 S. Ct. 140, 37 L. Ed. 1107; Texas & Pac. R. Co. v. Cox, 145 U. S. 593, 12 S. Ct. 905, 36 L. Ed. 829; Grand Trunk R. Co. v. Ives, 144 U. S. 408, 12 S. Ct. 679, 36 L. Ed. 485; Hampton v. Des Moines & Cent. I. R. Co. (C. C. A. 8) 65 F.(2d) 899; New York C. & St. L. R. Co. v. Boulden (C. C. A.) 63 F.(2d) 917; Glynn v. Krippner (C. C. A. 8) 60 F.(2d) 405; Chicago & N. W. R. Co. v. Struthers (C. C. A. 8) 52 F.(2d) 88; Chicago, St. P., M. & O. R. Co. v. Henkel (C. C. A. 8) 52 F.(2d) 313; Chicago, M., St. P. & P. R. Co. v. Busby (C. C. A.) 41 F.(2d) 617. The fact that hypotheses incompatible with the liability of the appellant may be conjectured or imagined when such are not based on any testimony in the case, affords no reason to reverse a verdict and judgment which is supported by the testimony. As this court said on the subject in Wabash Screen Door Co. v. Black, 126 F. 721, 725: "Doubtless a jury ought not to be permitted to speculate, in the sense of guess, between causes, when no reasonable explanation of the injury can be found in the testimony. Patton v. Texas Pac. Ry. Co., 179 U. S. 658, 21 S. Ct. 275, 45 L. Ed. 361; Duntley v. Inman & Co., 42 Or. 334, 70 P. 529, 59 L. R. A. 785; I. C. R. R. Co. v. Cathey, 70 Miss. 332, 12 So. 253, and other cases. But, in the absence of direct testimony, the simple suggestion of theories by the defense does not reduce the jury to mere speculation, and disqualify it from determining the cause of the injury complained of. The theories suggested may be forced and fanciful, finding no reasonable foundation in the facts proved. They may be explanations which do not explain; which the common sense of the jury, when applied to the testimony, would instantly reject."

Appellant also contends that the court should have directed a verdict in its favor on the theory that the death of appellee's husband resulted from his riding on the footboard of the engine in violation of appellant's rule No. 756. The rule provides:

"756. Stepping upon the front of an approaching engine; jumping onto or off a rapidly moving engine or train; getting between track rails to couple or uncouple moving cars; riding on footboard between engine and car, and all similar imprudences, are dangerous, in violation of duty and contrary to the rules and instructions.

"Riding on inside of loaded open-top cars is prohibited, and when riding on outside of such cars to use hand brakes, danger of injury from load shifting must be avoided."

The action is based on the Federal Employers' Liability Act (45 USCA §§ 51–59), and it is shown that the collision of the Illinois Central with the engine on and about which the decedent worked was the cause of the injury and death. Even if Farris had been negligent in being on the footboard instead of hanging to a grabiron on the engine collided with, still his injury and death resulted in whole or in part from the negligence of the carrier, within the provisions of the Employers' Liability Act. Union Pac. R. Co. v. Hadley, 246 U. S. 330, 38 S. Ct. 318, 62 L. Ed. 751; Rocco v. Lehigh Valley R. Co., 288 U. S. 275, 53 S. Ct. 343, 77 L. Ed. 743. It is also clear that the rule of the Terminal Company does not, by its terms, have any application to the facts in the case. Farris was not "riding" on the footboard between engine and car at the time of his injury.

The instructions of the trial court fairly and adequately submitted the issues to the jury and correctly stated the law, and we find no error therein.

The appellant also assigns as error that the verdict of the jury is grossly excessive and the result of passion and prejudice on the part of the jury, and that even after remittitur the verdict is still excessive. There is no evidence in the record that the verdict was the result of passion and prejudice, and this court has consistently held that the alleged excessiveness of a verdict cannot be considered by this court. Interstate Stage Lines Co. v. Ayers (C. C. A.) 42 F.(2d) 611, and

cases there cited; Kroger Grocery & Baking Co. v. Yount (C. C. A.) 66 F.(2d) 700, 705. In the last-cited case the court said: "It would seem to be unnecessary to consider the question that the judgment should be reversed because the verdict is excessive. This is a question addressed to the discretion of the trial court, and this court is without authority to review the amount of the verdict in a tort action."

The judgment is affirmed.